IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Maxwell Little, et al., | No. 1:18-CV-06954 |
| Plaintiffs, | |
| v. | Honorable Virginia M. Kendall |
| JB Pritzker for Governor, et al., | |
| Defendants. | |

**DECLARATION OF QUENTIN FULKS IN SUPPORT OF DEFENDANTS JB
PRITZKER FOR GOVERNOR, JULIANA STRATTON, AND CAITLIN PHARO'S
MOTIONS FOR SUMMARY JUDGMENT**

1.      I am over the age of 18 and competent to testify to the matters in this Declaration. I make this Declaration based on my personal knowledge and my review of business records stored in the ordinary course of Defendant JB Pritzker for Governor's (the "Campaign") business.

2.      I am the former Deputy Campaign Manager for the Campaign, the entity dedicated to electing JB Pritzker Governor of Illinois and Juliana Stratton Lieutenant Governor of Illinois in 2018. I served in that role for the 2018 gubernatorial election from March 2017 through November 2018.

3.      Prior to serving as the Deputy Campaign Manager for the Campaign, I worked for several other political organizations, including Priorities USA, EMILY's List, and the Democratic Congressional Campaign Committee.

**A.      Campaign Operations**

4.      JB for Governor was the political campaign dedicated to supporting the candidacy of JB Pritzker for Governor of Illinois and his running mate, Juliana Stratton, for Lieutenant Governor in the 2018 election.

149018449

5.     The Campaign operated beginning in 2017 through the gubernatorial election on November 6, 2018.

6.     During the 2018 gubernatorial race, there were two elections: the primary election on March 20, 2018, and the general election on November 6, 2018. In the primary election, Mr. Pritzker and Ms. Stratton competed against other Democrats to determine who would move on to the general election in November 2018. In the general election, Mr. Pritzker and Ms. Stratton ran against the gubernatorial candidates from the Republican Party.

7.     The weeks leading up to both elections were particularly important for the Campaign as it focused on turning out voters to support Mr. Pritzker and Ms. Stratton.

8.     On November 6, 2018, Mr. Pritzker was elected Governor and Ms. Stratton was elected Lieutenant Governor. They assumed their respective offices on January 14, 2019.

9.     Consistent with typical practice for political campaigns, the Campaign ceased active operations at the end of November 2018. In addition to the post-primary-election layoff discussed below, the Campaign laid off remaining employees at the end of November 2018 as it ended its active operations.

10.    At the height of its operations, the Campaign had 34 offices across Illinois and employed around 200 employees, most of whom were field organizers. At that time, the Campaign's senior staff, of which I was a part, were majority African American (I am African American), and roughly 45 percent of the Campaign's entire staff were people of color.

11.    Field organizers executed the Campaign's voter-outreach strategy by identifying supportive voters and then turning out those voters on election day. Field organizers were also responsible for recruiting and retaining volunteers to help meet voter-outreach goals and for garnering support among community stakeholders.

149018449

12.    The Campaign assigned field organizers numerical goals associated with those responsibilities. These goals changed over the course of the campaign but included, for example, an expectation that field organizers call a certain number of prospective voters in a given time period.

13.    Because the work assigned to field organizers required in-person interaction with voters and other stakeholders, as well as managing Campaign volunteers, field organizers were required to work primarily from physical offices or out in the community. The work could generally not be done remotely from an organizer's home.

14.    The Campaign's Field Department—the department responsible for creating and implementing the Campaign's voter-outreach strategy—was comprised of field organizers; regional field directors; deputy field directors; the Field Director, Emma Laurent; the Field Operations Director, Caitlin Pharo; and the Primary Election Director, Manfred Mecoy (who later became the General Election Director). Field organizers reported to a regional field director assigned to a particular region in Illinois, and regional field directors in turn reported to deputy field directors, who oversaw several regional field directors in specific areas. Deputy field directors reported directly to Ms. Laurent. Ms. Laurent and Ms. Pharo reported directly to Mr. Mecoy. Mr. Mecoy reported to me. I reported to Anne Caprara, the Campaign Manager.

15.    As Deputy Campaign Manager, I was responsible for, among other things, approving all non-senior employee hires, reassignments, and terminations. I also was generally involved in addressing and resolving human resources issues that arose on the Campaign, as information was reported to me from employees or other members of the Campaign's leadership team.

16.    The Campaign employed field organizers (and other staff) throughout the State of Illinois.

17. Field organizers were hired at various points throughout the duration of the Campaign as need arose, particularly in the months leading up to the general election in November 2018, as the Campaign had scaled down its operations for a period of time following the primary election in March.

18. The Campaign was dedicated to recruiting and hiring field organizers (and other staff) of diverse backgrounds and experiences. Consistent with its obligations under the law and its antidiscrimination policy, the Campaign used race-neutral and nondiscriminatory factors in making hiring decisions. The Campaign did not have any "quotas"—racial or otherwise—that applied to hiring any staff and did not allow race to be considered as part of the hiring process.

19. I understand that Ms. Laurent generally collected and tracked applications for field-organizer positions, and she would typically forward promising applications to deputy field directors or regional field directors as particular regions had staffing needs. I further understand that deputy field directors or regional field directors could decide whether they wanted to interview particular applicants, and they typically conducted the interviews with field-organizer candidates and then gave Ms. Laurent a recommendation after the interviews about whether they wanted the Campaign to hire the applicant.

20. I ultimately approved all decisions about hiring field organizers after receiving recommendations from Ms. Laurent and Mr. Mecoy. Ms. Caprara and I, in collaboration with Ms. Laurent and Mr. Mecoy, ultimately determined how many total field organizers the Campaign would hire and how many field organizers would be placed in each region.

21. When possible, the Campaign attempted to consider in which part of Illinois a particular applicant was interested in working or in what part of Illinois an applicant already lived, but the Campaign ultimately hired people for positions in locations where there was a staffing need.

149018449

22.    At the time the Campaign made an offer of employment, it generally informed the applicant where the offered position would initially be located.

23.    The Campaign's operations were organized into 15 regions, each region representing a different part of the state.

24.    Field organizers were assigned to regions depending on several factors, including the geographic size of the region, the density of population, the number of voters, and budgetary factors. The allocation of resources among regions also depended on similar factors.

25.    The Campaign's regions were further organized into "pods," each of which consisted of several regions.

26.    Relevant to Defendants' motions for summary judgment, before the primary election, Region 4 covered the southside of Chicago. Following the primary election, Region 5 covered the westside of Chicago, Region 6 covered the southside of Chicago, Region 7 covered the far southside of Chicago. Regions 5, 6, and 7 were part of Pod 4. Region 13 covered the Peoria area of Illinois, and Region 14 covered the Champaign-Urbana area of Illinois.

27.    Each region had a physical office. The Campaign selected offices based on the Campaign's budget, an office's proximity to voters and other stakeholders, available real estate, accessibility, and the suitability of particular office space for the Campaign's needs, among other things. Because the Campaign needed some office locations for only a relatively short amount of time—sometimes just months—the ability to secure a short-term lease consistent with the Campaign's available budget was also an important factor.

28.    Because of campaign finance regulations and political considerations, the Campaign could not simply accept donated office space from any source that might have offered it or just allowed its staff to work from offices leased by other political candidates or elected officials.

149018449

**B.**    **Plaintiffs' Hiring**

29.    From the Campaign's records, I understand that the Campaign hired Maxwell Little as a field organizer in Chicago, Illinois, on July 30, 2018. Mr. Little was assigned to an office in the Campaign's Region 5.

30.    From the Campaign's records, I understand that the Campaign hired Jason Benton as a field organizer in Chicago, Illinois, on June 30, 2018. Mr. Benton was assigned to an office in the Campaign's Region 5.

31.    From the Campaign's records, I understand that the Campaign hired Jelani Coleman as a field organizer in Chicago, Illinois, on August 28, 2018. Mr. Coleman was assigned to an office in the Campaign's Region 6.

32.    From the Campaign's records, I understand that the Campaign hired Celia Colón as a field organizer in Chicago, Illinois, on July 30, 2018. Ms. Colón was assigned to an office in the Campaign's Region 6.

33.    From the Campaign's records, I understand that the Campaign hired Kasmine Calhoun as a field organizer in Peoria, Illinois, on September 4, 2018. Ms. Calhoun was assigned to an office in the Campaign's Region 13.

34.    From the Campaign's records, I understand that the Campaign hired Erica Kimble as a field organizer in Chicago, Illinois, on June 7, 2018. Ms. Kimble was initially assigned to an office in the Campaign's Region 7, and she later transferred to the Region 6 office.

35.    From the Campaign's records, I understand that the Campaign hired Nathaniel Madison as a field organizer in Chicago, Illinois, on July 30, 2018. Mr. Madison was assigned to an office in the Campaign's Region 6.

149018449

36.     From the Campaign's records, I understand that the Campaign hired Tiffany Madison as a field organizer in Chicago, Illinois, on July 30, 2018. Ms. Madison was initially assigned to an office in the Campaign's Region 6, and she later transferred to the Region 5 office.

37.     From the Campaign's records, I understand that the Campaign hired James B. Tinsley as a field organizer in the Champaign area of Illinois, on July 30, 2018. Mr. Tinsley was assigned to an office in the Campaign's Region 14.

38.     From the Campaign's records, I understand that the Campaign hired Mark Walker as a field organizer in Chicago, Illinois, on July 30, 2018. Mr. Walker was initially assigned to an office in the Campaign's Region 5, and he later transferred to the Region 6 office.

39.     From the Campaign's records, I understand that the Campaign hired Kayla Hogan as a field organizer in Chicago, Illinois, on November 6, 2017. Ms. Hogan was assigned to an office in the Campaign's Region 4.

40.     From the Campaign's records, I understand that the Campaign hired Eric Chaney as a field organizer in Chicago, Illinois, on August 24, 2017. Mr. Chaney was assigned to an office in the Campaign's Region 4.

41.     At all relevant times, Richard Merritt was the regional field director for Region 4 until March 25, 2018, when he was laid off. I understand that Mr. Merritt is African American.

42.     At all relevant times, Alfred Eze was the deputy field director who oversaw Region 4 (along with other regions) until March 25, 2018, when he was laid off. I understand that Mr. Eze is African American.

43.     At all relevant times, DeJaun Jackson was the regional field director for Region 5 until September 2018 when he moved into another role with the Campaign. At that point, Larry Bowden was promoted and became the regional field director for Region 5.

149018449

44.     At all relevant times, Raynal Sands was the regional field director for Region 6 until September 2018 when she was terminated for sexual harassment (discussed further below). At that time, Joshua Doss was promoted and became the regional field director for Region 6.

45.     At all relevant times, Ebonee Dawson was the regional field director for Region 7 until September 2018 when she was promoted into the deputy field director role for Pod 4. At that time, Fidel Williams became the regional field director for Region 7.

46.     I understand that Mr. Jackson, Mr. Bowden, Mr. Doss, Ms. Dawson, and Mr. Williams are African American.

47.     At all relevant times, Zacharia Hartman was the regional field director for the Peoria office in Region 13. I understand that Mr. Hartman is white. Steven Oaks and Priyanka Khanna were regional field directors at various points for the Champaign office in Region 14. At all relevant times, Catherine Vegis was the deputy field director for Region 14. I understand that Mr. Oaks and Ms. Vegis are white and that Ms. Khanna is of South Asian descent.

48.     Gabriella Cascone was the Campaign's Training Director, and she did not directly manage any field organizers. I understand that Ms. Cascone is Latina.

**C.      Campaign Reporting and Human Resources Structure**

49.     I understand that at or around the time of Plaintiffs'[1] hire, they were provided a copy of the Campaign's employee handbook. I also understand that they each signed a written document acknowledging that they had reviewed the handbook.

50.     Attached as **Exhibit 1** to this Declaration is a true and correct copy of excerpts of the Campaign's employee handbook.

---

[1] Plaintiffs are the 12 plaintiffs in this matter: Maxwell Little, Jason Benton, Jelani Coleman, Celia Colón, Kasmine Calhoun, Erica Kimble, Nathaniel Madison, Tiffany Madison, James B. Tinsley, Mark Walker, Kayla Hogan, and Eric Chaney.

51.     Attached as **Exhibit 2** to this Declaration is true and correct copy of the handbook acknowledgment that Plaintiff Maxwell Little returned to the Campaign.

52.     Attached as **Exhibit 3** to this Declaration is true and correct copy of the handbook acknowledgment that Plaintiff Jason Benton returned to the Campaign.

53.     Attached as **Exhibit 4** to this Declaration is true and correct copy of the handbook acknowledgment that Plaintiff Jelani Coleman returned to the Campaign.

54.     Attached as **Exhibit 5** to this Declaration is true and correct copy of the handbook acknowledgment that Plaintiff Celia Colón returned to the Campaign.

55.     Attached as **Exhibit 6** to this Declaration is true and correct copy of the handbook acknowledgment that Plaintiff Kasmine Calhoun returned to the Campaign.

56.     Attached as **Exhibit 7** to this Declaration is true and correct copy of the handbook acknowledgment that Plaintiff Erica Kimble returned to the Campaign.

57.     Attached as **Exhibit 8** to this Declaration is true and correct copy of the handbook acknowledgment that Plaintiff Nathaniel Madison returned to the Campaign.

58.     Attached as **Exhibit 9** to this Declaration is true and correct copy of the handbook acknowledgment that Plaintiff Tiffany Madison returned to the Campaign.

59.     Attached as **Exhibit 10** to this Declaration is true and correct copy of the handbook acknowledgment that Plaintiff James B. Tinsley returned to the Campaign.

60.     Attached as **Exhibit 11** to this Declaration is true and correct copy of the handbook acknowledgment that Plaintiff Mark Walker returned to the Campaign.

61.     Attached as **Exhibit 12** to this Declaration is true and correct copy of the handbook acknowledgment that Plaintiff Kayla Hogan returned to the Campaign.

149018449

62.     Attached as **Exhibit 13** to this Declaration is true and correct copy of the handbook acknowledgment that Plaintiff Eric Chaney returned to the Campaign.

63.     The handbook included conduct standards and articulated expectations for Campaign staff in fulfilling their work. The Campaign also expressed expectations for staff in policies and practices implemented through employees with supervisory responsibility. The Campaign expected, for example, that all field organizers would be on time to work barring extenuating circumstances, would be respectful to their supervisors and co-workers, and would follow reasonable instructions from their supervisors.

64.     The Campaign's anti-discrimination and anti-harassment policy, as articulated in the handbook, specified a reporting structure and expectation for reporting discrimination and harassment.

65.     After her hire, Ms. Pharo was typically the initial contact for human resources ("HR") issues. Depending on the particular issue, Ms. Pharo typically investigated the issue and then often followed up with Mr. Mecoy and me as appropriate for further investigation or other next steps.

66.     Starting in February 2018, the Campaign maintained an email address dedicated solely to HR reports from employees, which I understand that Ms. Pharo checked multiple times a day.

67.     The Campaign attempted to provide an initial response to all email complaints sent to that email address (and complaints delivered via other means) within 12 hours.

68.     The Campaign also sought to take reasonable steps within 36 hours of an initial complaint to develop solutions to the reported issue. The "solutions" would, however, differ depending on the circumstances of the issue reported. For example, a more serious or complex situation might mean that the Campaign's preliminary solution was to identify the need for

-10-

additional investigation. These preliminary solutions might only be shared internally among

Campaign leadership. A less serious or complex situation might, by contrast, allow the

Campaign to communicate directly to the employee involved the steps that the Campaign was

taking to address the issue.

69.     The Campaign's internal goal of proposing solutions within 36 hours was not intended to

guarantee that the Campaign would definitively resolve all complaints within 36 hours and to

communicate a final resolution to the reporting employee within 36 hours.

70.     Employees could also raise HR issues directly with any staffer in the Campaign's

leadership.

**D.      Reassignment Before the Primary Election**

71.     In January 2018, just less than two months away from the primary election, the Campaign

decided to reassign several field organizers to new offices to better align the Campaign's staff

capacity with its field-operation needs as election day approached. As part of that effort, the

Campaign decided to reassign seven field organizers who had been working in the greater

Chicago area. In my experience, it is very common for political campaigns to reassign field staff

based on evolving campaign needs at different points in the election cycle.

72.     In making the reassignments, the Campaign considered its business needs. The

Campaign's overall goal was to ensure that its staffing capacity was fully utilized, while

allowing the transferred field organizers to be successful in their new regions. To that end, the

Campaign also generally attempted to consider and minimize the impact on the affected

organizers' commutes, although such an impact was sometimes unavoidable.

73.     With those reassignments, Ms. Hogan and Mr. Chaney would have kept the same title,

same job responsibilities, and same pay and benefits.

74.    I am personally aware that during this process, two field organizers—Kayla Hogan and Eric Chaney—refused their reassignments.

75.    In January 2018, the Campaign informed Ms. Hogan that she would be transferred to Region 1, which at that time covered the south suburbs of Chicago.

76.    When I learned that Ms. Hogan refused to accept the reassignment, I initially told her that her options were to move to Region 1 or leave the Campaign's employment. After giving the issue further thought, however, I offered Ms. Hogan three options to consider: (1) accept the reassignment to Region 1, (2) move to a different region (the southeast side of Chicago), or (3) explore an opportunity to join a paid canvass team run by an organization that worked with the Campaign.

77.    In January 2018, the Campaign also informed Mr. Chaney that he would be reassigned to the region in the collar counties around Lake County.

78.    After meeting with Ms. Pharo and Mr. Mecoy to express concerns about the reassignment, Mr. Chaney met with Ms. Caprara and me. During that meeting, Mr. Chaney asked if he could be reassigned to the northern area of Chicago or take on some other role on the Campaign. At that time, there were no available positions in that area of Chicago or any other open roles for which Mr. Chaney was qualified, and we informed him of that. Mr. Chaney had been given the opportunity earlier to consider a position with the paid canvass team, as had Ms. Hogan, but he opted not to take that option.

79.    Mr. Chaney also expressed that he might be interested in leaving the Campaign's employment if he were to receive a severance payment. Ms. Caprara and I also offered him that option, but he ultimately declined it.

-12-

149018449

80.     Neither Ms. Hogan nor Mr. Chaney took any of the offered options or did any further substantive work for the Campaign between the end of January when the reassignments were announced and the end of their employment on March 25, 2018. They were, however, both paid their full salaries and benefits during that time.

81.     Richard Merritt, Ms. Hogan's and Mr. Chaney's supervisor, was not, to my knowledge, involved in the decision to reassign them or the other field organizers also reassigned at the same time.

**E.     Post-Primary Layoff**

82.     Shortly before the primary election on March 20, 2018, Campaign leadership undertook efforts to better align the Campaign's staffing with its needs in the period immediately after the primary election and in the subsequent ramp-up to the general election on November 6, 2018. In the period immediately following the primary election on March 20, 2018, until about May 2018, the Campaign required fewer field staff than the Campaign generally had at other times during the election cycle.

83.     For purposes of this layoff, Campaign leadership identified underperforming employees that the Campaign thought unsuited to continuing their employment with the Campaign. Given the short time period leading up to the primary election, and the disruption caused by ending a field organizer's employment, the Campaign had not always immediately terminated organizers about whom it had performance concerns, recognizing that the post-primary period would provide a natural opportunity to review the Campaign's structure and workforce. I viewed underperforming employees, for purposes of this layoff, as those who had not been fulfilling their job duties, such as meeting their goals for contacting voters or recruiting volunteers, and/or those whose behavior had fallen short of the Campaign's expectations, including those articulated in the Campaign's employee handbook.

-13-

84.     Subject to Ms. Caprara's ultimate approval, I was responsible for approving a layoff and for approving which employees would be included in the layoff.

85.     Just after the primary election on March 20, 2018, Mr. Mecoy presented me with the names of employees he believed should be included in the layoff. I understood that Mr. Mecoy and Ms. Pharo had reviewed this list before I did. I further understood that Mr. Mecoy had consulted Lauren Brainerd, a senior advisor to the Campaign, about the employees before he presented the list to me.

86.     The list did not include either Ms. Hogan or Mr. Chaney. I was familiar, however, with their refusals to work over the previous two months and made the decision to include them in the group of employees to be laid off.

87.     Ms. Caprara and I ultimately approved laying off the employees, including Ms. Hogan and Mr. Chaney. Approximately 30 other employees, the majority of whom I understand to be white, were included in the layoff.

88.     Mr. Merritt and Mr. Eze were also included in the layoff. I did not ask for or consider their input in making any decisions about who to include in the layoff.

**F.      Sexual Harassment Allegations**

89.     On September 2, 2018, I learned that Ms. Madison had reported, via the Campaign's dedicated HR email address, that her supervisor, Ms. Sands, had sent her explicit videos and messages and made inappropriate comments to Ms. Madison.

90.     Just hours after Ms. Pharo was able to speak with Ms. Madison on September 3 and to follow up with Ms. Sands about the allegations, I determined, along with Ms. Caprara, Mr. Mecoy, and Ms. Pharo, that Ms. Sands would be terminated immediately because we believed that we had substantiated that Ms. Sands had engaged in conduct that violated Campaign policy and expectations.

-14-

149018449

91.     The Campaign also moved Ms. Madison to Region 5 because, even though Ms. Sands had been terminated, the Campaign wanted to give Ms. Madison the opportunity to work in a new location.

92.     After Ms. Sands was terminated, I learned that Ms. Sands had sent the Campaign additional text messages with Ms. Madison that suggested there was a consensual relationship between the two of them. At a meeting on September 19 with Ms. Madison (described more fully below), I asked Ms. Madison about those messages. I believed it appropriate to ensure that I fully understood the facts although before this conversation, I had already determined that even if there had been a consensual relationship, I would not revisit the decision to terminate Ms. Sands's employment given that she had been Ms. Madison's direct supervisor.

**G.     Cultural Sensitivity Training**

93.     On September 11 and 12, 2018, the Campaign brought together its entire staff for a multi-day training focused on voter engagement and mobilization. One of those sessions, which took place on September 12, was a session on cultural sensitivity. The Campaign had conducted anti-harassment training earlier in the Campaign.

94.     Members of Campaign leadership had been planning a cultural-sensitivity training earlier in the Campaign, and I was not involved in preliminary planning discussions. When I was informed about those discussions, I believed it was important for to Campaign to identify a different trainer who had a legal background and for me to be involved in further planning. The training was ultimately planned for later in the summer.

95.     At the training on September 12, every Campaign staff member—including those in leadership—was expected to attend the training because the training was incredibly important as a tool in furthering the Campaign's commitment to an inclusive and diverse workplace.

149018449

96.     Because the training was so important, the Campaign collected phones from every staff member—including those in leadership—to ensure that everyone gave the training their full attention. My experience has been that if people have their phones during a training, some of them may be tempted to continue to do work, surf the internet, or otherwise disengage from the training. I did not want this to happen during the cultural sensitivity training.

97.     An outside attorney retained by the Campaign developed and presented the training. Among other things, her presentation included information about both explicit and implicit biases. On one slide, the concept of how people can be unaware of how their brain works at the unconscious level was illustrated by way of a video about a famous study in which viewers are told to focus on how many times a ball is passed by people in the foreground. Many viewers "miss" that a person wearing a costume then walks through the background of the video. This presentation also identified language—including some specific examples—that was unacceptable for use in the workplace regardless of who says it or in what context.

98.     Attached as **Exhibit 14** to this Declaration is a true and correct copy of the presentation.

99.     There was a short question-and-answer session at the end of the training, but not all questions could be answered because we had other sessions scheduled for the day and needed the group to move on to the next training session.

100.    But even though there were other sessions, I told everyone at the training that I would make myself available immediately after the session. I stepped out of the training room and then answered additional questions for a significant length of time—I'd estimate somewhere between 90 minutes and two hours—for anyone who approached me.

101.    After the training, several field organizers reported to me that in the short break between the session proceeding the cultural sensitivity training and the training itself, Ms. Dawson, the

-16-

149018449

deputy field director of Pod 4, had pulled them aside to express her view of the training and said not to say anything stupid during the training.

102.    Two of those field organizers, Mr. Little and Ms. Madison, also submitted written complaints in which they expressed concerns with Ms. Dawson's comment. Mr. Little also expressed concern that Ms. Pharo had sat between him and another African-American staff member during the training, and Ms. Madison expressed concern with the Campaign's follow-up to her earlier reports of sexual harassment.

103.    On September 14, the day after Mr. Little submitted the complaint, I called Mr. Little to confirm that I was investigating the complaint.

104.    The day after the cultural sensitivity training, I reached out to Ms. Madison to ask if she wanted to meet to further discuss the events she had raised the day before the training. Ms. Madison and I had spoken briefly the day before the cultural sensitivity training when I asked for additional information about Ms. Madison's concern about how raising reports to her chain of command was not being effective during a question-and-answer session that day with Ms. Caprara and me.

105.    Ms. Madison and I planned to meet on September 19. In the meantime, on September 16, I understand that Ms. Madison sent the Campaign's HR email address a complaint about Ms. Dawson's statement at the cultural sensitivity training.

106.    I met with Ms. Dawson to discuss the comment. Ms. Dawson confirmed that she had met with the organizers she managed before the training to express her view that the training was not, in all respects, what she would have preferred and that no one from Campaign leadership had told her to tell them not to say anything stupid.

149018449

107.     I believed that the incident with Ms. Dawson pulling aside the staff members she organized presented a teachable moment that was best handled by counseling Ms. Dawson. I told her that it was inappropriate to pull them aside and to comment on the training, and I made clear that we expected her not to make similar statements in the future. I did not believe that additional disciplinary action against Ms. Dawson was warranted beyond this verbal warning. I am not aware of any additional incidents in which Ms. Dawson was alleged to have made a similar comment.

108.     I understood from our discussion that Ms. Dawson intended to apologize to the staffers in Pod 4.

109.     On September 19, 2018, I met with Ms. Madison after she expressed concern about Ms. Dawson's comment before the cultural sensitivity training. I told Ms. Madison that Ms. Dawson should not have made the comment and that no one in Campaign leadership had instructed Ms. Dawson to talk to the field organizers in her pod before the training.

110.     On September 25, I understand that Ms. Caprara held a conference call with the employees in Pod 4 to explain the investigation with regard to Ms. Dawson's comment and the resolution of that issue.

## H.     Temporary Housing for New Employees

111.     Some Campaign employees relocated to Illinois from other states to work on the Campaign. In these cases, the Campaign generally attempted to facilitate housing as described below, given that many of the Campaign's employees were hired for a relatively short period of time to work only through the general election in November 2018.

112.     The Campaign had a limited budget for assisting staff with temporary housing, which meant that, if needed, the Campaign could at most provide employees who were relocating to

149018449

Illinois a few days of housing at area hotels at the beginning of an employee's employment until other housing was secured.

113.     Otherwise, and consistent with routine practice by political campaigns, the Campaign attempted to identify community members who supported the Campaign and were willing to offer temporary housing in their personal homes for employees who wanted help securing housing for the duration of their employment. These supporters were not employees of the Campaign, the Campaign did not enter into any contract with them to provide housing, and the Campaign did not provide any compensation to them. The Campaign simply connected employees with community members who volunteered to lodge Campaign employees on a temporary basis.

114.     The Campaign identified a family in Peoria that agreed to house Ms. Calhoun during her employment, but the family was unavailable at the last minute.

115.     The Campaign's initial understanding was that the family's circumstances had changed, and they no longer had space to house Ms. Calhoun. In any event, after the housing for Ms. Calhoun fell through, the Campaign did not contact this family again about housing any other staffers.

116.     When the Campaign learned that the family was no longer available to house Ms. Calhoun, the Campaign arranged housing at area hotels and with local Democratic Party members for Ms. Calhoun every day that she was employed and starting the day *before* her employment with the Campaign actually started. The Campaign reimbursed Ms. Calhoun's supervisor, Mr. Hartman, for the hotels he booked.

117.     At the all-staff training over September 11 and 12, I spoke with Ms. Calhoun about her housing and she told me that she did not like the hotels that the Campaign had booked for her to

-19-

that point. She never told me about her any specific interactions with anyone at any of the hotels. Although I believed the Campaign was doing everything possible to help Ms. Calhoun find housing and had indeed arranged housing through the remainder of the Campaign, I took Ms. Calhoun's concerns seriously. I told Ms. Calhoun that she could relocate to Chicago if she wanted.

118.    I have since learned that Ms. Calhoun alleges that the family who had initially agreed to house her in Peoria backed out once they learned that she is African American. Ms. Calhoun never reported that to me.

119.    Ms. Calhoun resigned the next day instead of staying in Peoria in the housing the Campaign had facilitated or relocating to Chicago as I had suggested would be an option for her if she wished.

120.    I conducted an exit interview with Ms. Calhoun the week after she resigned. At that meeting, I told Ms. Calhoun that she could return to the Campaign and work in Chicago if she wanted but she declined that offer.

121.    I was not aware until this lawsuit was filed that Ms. Calhoun asserted that her supervisor had made a comment that she was hired to meet a "black female quota." To the best of my knowledge, Ms. Calhoun did not report this alleged comment to the Campaign. To be clear, the Campaign did not utilize any such "quota," and this comment would not have made any sense because Ms. Calhoun was the only field organizer based in Peoria.

**I.      Campaign Event with President Barack Obama**

122.    On September 7, 2018, President Barack Obama attended an event at the University of Illinois in the Champaign-Urbana area. Mr. Pritzker attended that event, but the Campaign had not been involved in the planning of the event. Afterwards, Mr. Obama and Mr. Pritzker visited a local coffee shop together and met with people from the community who were at the coffee shop

at the time. I was responsible for coordinating the coffee-shop appearance, and given the obvious

safety issues involved with Mr. Obama's appearance, the appearance was kept highly

confidential beforehand.

123.    I never—and to my knowledge, no one else on the Campaign ever—instructed Mr. Oaks

to "round up 40 black guys" for the coffee-shop appearance or any other event, to ask any of the

field organizers he supervised to "round up 40 black guys" for any event, or to request that only

African-American staff members help identify community members to invite to any event. Nor,

to the best of my knowledge, did Mr. Oaks tell anyone to "round up 40 black guys" for any

event.

**J.    Plaintiffs' Demand Letter**

124.    On Friday, October 5, 2018, nine of the current Plaintiffs sent the Campaign a demand

letter for, among other things, $7.5 million. This letter was sent to the Campaign's outside

counsel and was referred to the Campaign later that day.

125.    Attached as **Exhibit 15** to this Declaration is a true and correct copy of that demand

letter.

126.    After this lawsuit was filed just three weeks before Election Day on November 6, 2018,

the press demonstrated interest in the suit and Plaintiffs' allegations. In responding to the press

interest, the Campaign provided portions of Plaintiffs' demand letter, as well as statements from

the candidates.

**K.    Safety Concerns Related to Region 6**

127.    In October 2018, it came to my attention that one of the field organizers in Region 6,

Tiffany Holmes, had sent an email to the Campaign's HR email address raising issues about the

safety of the area surrounding the Region 6 office. I and others in Campaign leadership,

including Ms. Laurent and Ms. Pharo, took those concerns seriously. With my approval, new

-21-

office hours were established for Region 6, which allowed the field organizers to start their day earlier and leave the office an hour earlier in the evening. The Campaign also allowed the Region 6 field organizers to make calls out of a different office one day a week.

128.    The Region 6 office was located in an office space that had been used by many prior political campaigns unaffiliated with the Campaign.

**L.    Paid Administrative Leave**

129.    Throughout the Campaign, several of the Plaintiffs had engaged in conduct that fell far short of the Campaign's expectations for field organizers, including failing to show up for work or leaving early, falsely or incompletely reporting data related to their numerical field goals, and displaying a disrespectful and combative attitude toward their co-workers and supervisors.

130.    The Campaign also set goals for every field organizer related to their organizing responsibilities—such as numbers for voters contacted at their doors and by phone—and expected organizers to work diligently toward meeting those goals.

131.    After ten Plaintiffs initially filed suit on October 16, 2018, I learned that several of the Plaintiffs continued to perform poorly and engage in concerning behavior. I also learned that some of those Plaintiffs also began to harass other Campaign staffers about those staffers' stance on the lawsuit.

132.    These concerns were reported to me up the chain. When the Campaign received reports of behavior such as this, its standard practice—regardless of the race of the staff members involved—was to conduct a review of the situation.

133.    On October 24, 2018, the Campaign placed on paid administrative leave Mr. Little, Mr. Walker, Mr. Coleman, Ms. Colón, and Ms. Kimble. The Campaign paid them their full salaries and benefits through November 2018 before winding up operations. The Campaign paid all other field organizers through November 2018.

-22-

134.    The Campaign was unable to return Mr. Little, Mr. Walker, Mr. Coleman, Ms. Colón, or Ms. Kimble to work before winding up operations.

**M.      Charcoal Facial Mask**

135.    Toward the end of October 2018, the Campaign learned about a video that had apparently been taken in the Campaign's downtown Chicago headquarters after hours. The video is taken in the style of an online beauty tutorial and was posted on an Instagram account. In the video, a staffer (who is Caucasian) applied a face mask containing charcoal while narrating its application. The media inquiries suggested that the charcoal face mask had been interpreted by some viewers as reminiscent of blackface.

136.    I investigated the incident by interviewing the two staff members involved in the incident. Although we determined that there had been no intent to appear in blackface or to even suggest the appearance of blackface, and that the "beauty tutorial" nature of the video was immediately evident upon viewing it, Ms. Caprara and I determined that the two staff members had exercised poor judgment regardless of their intent. We subsequently terminated their employment. Based on my review of the situation, my understanding is that none of the Plaintiffs were present in the office when this video was filmed and so did not directly witness the application of the face mask or observe the employee wearing it.

//

//

//

//

149018449

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 10th day of September, 2020, at Chicago, Illinois.

Quentin Fulks

149018449