IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MAXWELL LITTLE, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 18 cv 6954 |
| ) | |
| JB PRITZKER FOR GOVERNOR, et al., ) | Judge KENDALL |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' JOINT STATEMENT OF ADDITIONAL FACTS**

NOW COME the Plaintiffs, MAXWELL LITTLE, JASON BENTON, JELANI COLEMAN, CELIA COLON, KASMINE CALHOUN, ERICA KIMBLE, NATHANIEL MADISON, TIFFANY MADISON, JAMES B. TINSLEY, MARK WALKER, KAYLA HOGAN, and ERIC CHANEY, by and through their counsel, S.T. Allen Law, P.C. and SHILLER PREYAR JARARD & SAMUELS, pursuant to Fed. R. Civ. P. 56 and L.R. 56.1(b)(3), providing the following statement of additional facts in support of their response in opposition to the Defendants' Motion for Summary Judgement. In support thereof, Plaintiffs state as follows:

**Defendants Took No Action to Implement their Anti-Discrimination Policy**

1. The Campaign never issued any memo or guideline to implement its Equal Employment Opportunity Policy. (Exhibit 13, Campaign's 30(b)(6) Deposition, p. 93:2-13)

2. Pursuant to the Campaign's employee handbook, "[a]ny manager who receives a complaint of possible discrimination, harassment, retaliation, must notify the Deputy Campaign Manager immediately." (Exhibit 13, Campaign's 30(b)(6) Deposition, p. 109:12-19)

3. Deputy Campaign Manager Quentin Fulks and Campaign Manager Anne Caprara were responsible for investigating allegations of misconduct. (Exhibit 13, Campaign's 30(b)(6) Deposition, p. 137:2-20).

4. Deputy Campaign Manager Quentin Fulks had no HR experience prior to joining the Pritzker Campaign and besides conversations with the Campaign Manager, received no training on how to handle HR issues. (Exhibit 13, Campaign's 30(b)(6) Deposition, p. 29:1-4, 30:3-12).

5. The Campaign never updated their Handbook to incorporate that field organizers could file a complaint by emailing the "hr@" email address. (Exhibit 13 Campaign's 30(b)(6) Deposition, p. 33:10-18, 34:11-16).

6. The Campaign did not keep track of the number of complaints made against an individual or the types of complaints that were being made. (Exhibit 13, Campaign's 30(b)(6) Deposition, p. 142:2-19), 149:17-150:1).

7. Caitlin Pharo and Manfred Mecoy were responsible for responding to and investigating complaints made to the "hr@" email address, but any complaint dealing with discrimination should have been brought to Fulks' attention. (Exhibit 13, Campaign's 30(b)(6) Deposition, p.154:21-24, 169:4-12, 170:9-13, 171:7-13).

**The Campaign Did Not Respond to Complaints of Racial Discrimination or Discipline Personnel for Violating the Anti-Discrimination Policy**

8. Fulks thought the entirety of Montgomery's complaint regarding Mo Shatara was that he used the "n-word" while rapping along with music; Pharo never told him about his other racially discriminatory behavior or showed him Montgomery's complaint. (Exhibit 13, Campaign's 30(b)(6) Deposition, p. 195:7-24; Exhibit 20, Deposition of Quentin Fulks, p. 97:4-98:20)

9. Fulks did not learn of Calhoun's complaints until she personally approached him; Pharo never brought them up to him. (Exhibit 20, Deposition of Kasmine Calhoun, p. 180:4-181:10)

10. Pharo never told Fulks that Chaney complained about his direct supervisor calling him a "nigglet"; Chaney contacted Fulks on his own. (Exhibit 20, Deposition of Caitlin Pharo, p. 146:5-20)

11. The campaign purported to have a zero-tolerance discrimination and harassment policy. (Exhibit 13, Campaign's 30(b)(6) Deposition, p. 42:2-16).

12. No person was ever demoted on the Campaign on the basis of misconduct. (Exhibit 13, Campaign's 30(b)(6) Deposition, p. 57:19-24).

13. Lt. Governor Stratton expected, for example, that a person would have been fired from the campaign for referring to a subordinate using the n-word. (Exhibit 14, Deposition of Juliana Stratton, p. 66:17-67:3)

14. Mohammad Shatara remained an active employee on the Campaign through its conclusion and can be seen in the background of the Blackface video that was taken at Campaign Headquarters. (Exhibit 15, Blackface Video Screenshot)

**The Campaign Segregated Its Workers and Assigned Work/ Resources Based Upon Race**

15. After the primary, Mohammad Shatara was named the DFD in charge of POD 4, which was comprised of the Westside, Southside, Far Southside Offices in Chicago. (Exhibit 21, Jessica Montgomery's Complaint)

16. POD 4 Was Primarily Responsible for the Campaign's "Black Outreach." (Exhibit 21, Jessica Montgomery's Complaint)

17. Raynal Sands, Joshua Doss, and Ebonee Dawson referred to the Southside office as the Black region and told its field organizers that they were responsible for Black outreach.

18. Raynal Sands told employees that they were hired and/or assigned turfs on the basis of their race. (Exhibit 17, Declaration of Jelani Coleman, ¶14-16; Exhibit 18, Declaration of Nathaniel Madison, ¶9-10).

**Black and Latino Workers Were Treated Less Favorably than their Similarly-Situated White Counterparts**

19. The Campaign's Northside Office was located at 1051 W Belmont Ave, Chicago, IL 60657. From 1 May 2017 to 30 November 2018, there were no calls for assistance, investigation, and/or arrest for the address. (Exhibit 18, Declaration of Nathaniel Madison, ¶¶12-15).

20. Meanwhile, the Campaign's Southside office was located at 5401 S. Wentworth, Chicago, Illinois. From 1 May 2017 to 30 November 2008, there were over 89 calls

for assistance, investigation, and/or arrest for the address. (Exhibit 18, Declaration of Nathaniel Madison, ¶¶12-15).

21. After providing proof of a rodent infestation at the Campaign's Westside Office, it was moved to the intersection of Chicago and Pulaski that was located across the street from an open-air illegal drug market. (Exhibit 10, Deposition of Mark Walker, p. 75:22-76:11, 80:7-15).

22. The Southside and Westside offices had leaks in their ceiling; although Southside field organizers and the Southside RFD complained about the leak, it was never fixed. (Exhibit 7, Deposition of Nathaniel Madison, p. 70:2-11; Exhibit 10, Deposition of Mark Walker, p.76:22-77:10)

23. POD 4 had consistently unreliable Wi-Fi that often resulted in them having to work remotely and/or close the office completely. (Exhibit 12, Deposition of Eric Chaney, p. 157:18-159:2).

**The Campaign Crafted, and Defendant Stratton Implemented, a Public Relations Strategy to Defame Plaintiffs by Labelling Them Extortionists**

24. Stratton called the Plaintiffs extortionists, said their claims were baseless, and told the media that they demanded money within 24 hours or they would go to the press. (Exhibit 10, Deposition of Mark Walker, p. 192:1-192:6; Exhibit 14, Deposition of Juliana Stratton, p. 87:16-88:3).

25. In addition to releasing a press statement, the Campaign drafted a response to the Plaintiffs and would have its media team speak with reporters off the record. (Exhibit 20, Deposition of Quentin Fulks, p. 172:11-176:11)

**Plaintiffs Complained of Racial Discrimination and Harassment**

26. Plaintiff Kasmine Calhoun complained that she was discriminated against and harassed when, among other things:
    a. She was told by her supervisor that she was hired to fill a racial quota;
    b. She was told by her supervisor that that the person whose position she filled was a Black female field organizer;
    c. She was told by her supervisor that that she was hired because she was more approachable than a Black male;

    d. She was the only Black person and only female working for her supervisor;
    e. She was forced to work in an office in an unsafe location by herself;
    f. She was forced to be personally appear at the office while her white male counterparts were allowed to telecommute and/or appear via video conferencing for meetings;
    g. When she complained about being called the N-word, Defendant Pharo told her that "she should be used to it" and "to deal with it";
    h. When she complained about being housed in a dirty, unsafe location, Defendant Pharo told her that "she should be used to it" and "to deal with it";
    i. Defendant Pharo denied her adequate housing because it was allegedly not in the budget even though her recommendations fell well within the $150/night limit for hotel room listed in the employee handbook;
    j. Defendant Pharo denied her request for a transfer even though there were other open positions;
    k. She was denied supporter housing because she was Black;
    l. She was made fun of by her supervisors for crying and trying to find supporter housing;
    m. Defendant Pharo refused to apologize for failing to take her complaints seriously;
    n. Her supervisor was not disciplined or reprimanded for making racist statements;
    o. Defendant Pharo was not disciplined or reprimanded for ignoring her complaints, failing to take them seriously, and refusing her accommodations;
    p. Quentin Fulks told her that her requests for housing and/or a transfer should have been granted but were not; and
    q. Quentin Fulks told her that this campaign does not give a fuck about us or value Black people.

(Exhibit 5, Deposition of Kasmine Calhoun, pp. 96:11-13, 102:5-19, 104-105, 114:13-116:24, 118, 123-124, 131-136, 154, 158, 162, 165, 177, 184, 196, 198, 206, 208, 222, 256).

27. Plaintiff Maxwell Little complained that he was discriminated against and harassed when, among other things:
    a. Working in the Westside office that was located in a high crime area, populated by large amounts of drug dealing, drug usage, prostitution and gang violence.
    b. The Westside office itself had rats, roaches and mold in the bathrooms.

    c. The many complaints about the condition of the Westside office to supervisors were completely ignored by the Campaign and the office was only changed after the condition of the Westside office was made public.
    d. Noticing the offices of non-minority field organizers to be of a substantially higher quality.
    e. Denied opportunities of advancement. Maxwell was not given the opportunity to apply for the Regional Field Director position vacated by his former supervisor DeJuan Jackson. The opening was not posted in any fashion.
    f. Even though Maxwell had no connection to the Westside of Chicago, Maxwell was placed in Region 5 because he is African-American.
    g. Not receiving sufficient support from headquarters to successfully complete his tasks as a field organizer.
    h. Not allowed similar access to the candidate as other non-minority field organizers.
    i. Date entered in VAN was tampered to reflect lower numbers.
    j. Herded into a group at "cultural sensitivity" training and told not to say "anything stupid"
    k. Caitlin Pharo sat between Maxwell and another African-American organizer in order to intimidate them.
    l. So disgusted by "cultural training" got up and left the room.
    m. In response to a written complaint by Maxwell complaining of the discrimination and harassment at the "cultural sensitivity" training, the Campaign Manager Anne Capara haphazardly organized a meeting, where all people who were told not say "anything stupid" were not present. Furthermore, on the call Anne Capara screamed, curse and intimidated everyone on the call.

(Exhibit 1, Deposition of Maxwell Little pp. 149-150:1-6, 152, 155: 11-12, 153-158, 63: 17-23, 65: 5-9, 63: 17-23, 67-68, 68: 23-24, 69: 1-16, 68: 17-22, 113: 6-7, 125-127, 115-117, 100-101, 101: 3-4, 101: 12-19, 135: 1-13, 135-136).

28. Plaintiff Jason Benton complained that he was discriminated against and harassed when, among other things:
    a. Jason observed the Westside office had roaches, rats, holes in windows, water leaking from the ceiling, issues with the plumbing, molded carpet and dust mites.
    b. Jason observed the unsafe neighborhood where the office was located where several days a week, he heard gunshots, saw various drug dealers and gang activity.

    c. Jason reported the plethora of problems with the office and neighborhood to his supervisor and nothing was done.
    d. The one white field organizer that was sent to the Westside office was gone in two days.
    e. Being placed at the Westside office only because he was African-American as he had no prior affiliations with the Westside. Jason hails from the South Suburbs and requested to be swapped with a fellow field organizer who was struggling in the South Suburbs. This request was denied.
    f. Not receiving proper support in the form of funds for food and supplies from headquarters to be successful.
    g. Jason was not allowed to apply for any supervisor roles for which he was qualified due to prior experience due to not being aware of the opportunities.
    h. The Campaign failed to follow up on a partnership with a large nonprofit organization worked out by Jason.
    i. Jason constantly brought his complaints to his supervisor but to no avail.
    j. Jason was told at the "cultural sensitivity" not to "say anything stupid" at the training by his supervisor.
    k. During the "cultural sensitivity" training Jason noticed Emma Laurent become visible angry with an African-American field organizer for asking a question, endured a video of a gorilla that was used in connection to African-Americans and the use of the term "wetback" during the training when referring to Latinos.
    l. Had Caitlin Pharo sit very close to Jason in order to intimidate him during the training.

(Exhibit 2, Deposition of Jason Benton, pp. 250: 8-20, 95: 12-24, 96: 1-2, 94: 18-24, 95: 9-10, 110: 18-19, 13: 20-22, 102: 7-24, 103: 1-14, 104: 11-24, 105-106: 1-17, 140: 2-24, 141: 16-20, 117: 11-15, 82: 18-23, 120: 19-24, 121-125, 263-265, 138: 20-21, 140: 1-20, 144-150, 152: 15-24, 153: 1-13, 270-272: 1-18, 277-278:1-8, 179-180, 184: 14-24, 185-186).

29.     Plaintiff Jelani Coleman complained that she was discriminated against and harassed when, among other things:
    a. His job position was changed;
    b. He was sent to work at an office with wi-fi that did not regularly work;
    c. He was sent to work at an office in an unsafe location;
    d. His complaints about the unreliable wi-fi were ignored;
    e. His complaints about the safety of the office were ignored;
    f. In response to complaints about his safety he was told that the campaign's numbers were more important;

  g. He was sent to work in a dangerous neighborhood because of his race;
  h. He was sent to work in a very dangerous neighborhood without any warning;
  i. He was micromanaged by his supervisors;
  j. He was not allowed to telecommute to work;
  k. He was told by his supervisor that they only hired Black people to work in his region;
  l. He was told by his supervisor that the candidate would not visit them because it was not safe;
  m. He was told that in order to get the candidate to visit they had to have a certain number of Black voters in the office;
  n. He was not given the materials he needed to complete his job, such as literature;
  o. He was not given supporter housing;
  p. His supporter housing was cancelled because he was black;
  q. He was given a subpar hotel to live in while awaiting supporter housing;
  r. The campaign forced him to stay at the subpar hotel despite his complaints;
  s. The campaign placed a supervisor over his office who already had a history misconduct;
  t. The campaign manager became angry when his coworkers brought up their complaints;
  u. The campaign showed a video of a gorilla interrupting white people at cultural sensitivity training;
  v. He was accosted immediately prior to cultural sensitivity training by his supervisor;
  w. He was "suspended pending investigation" even though he had done nothing wrong;
  x. He was told by his supervisor that he was being watched;
  y. He was told by his supervisor that the campaign asked that he be written up for even the most minor of infractions;
  z. He was told that he should not have been turfed in Chicago but a more rural area; and
  aa. A racial epithets were used during cultural sensitivity training.

(Exhibit 3, Deposition of Jelani Coleman, pp. 37:19-38:1, 38:11-20, 44:17-23, 47:15-20, 49:11-20, 51:22-52:6, 54:4-16, 60:21-24, 62:11-19, 64:21-65:12, 67:2-12, 68:17-69:16, 74:10-75:5, 88:21-89:7, 96:10-18, 98:14-22, 100:4-6, 126:16-127:5, 130:16-23, 132:14-133:9, 133:20-134:8, 134:9-135:16, 144:9-22, 150:8-151:4, 153:16-154:3, 154:20-155:9, 159:20-160:13, 162:16-24, 171:19-172:13, 172:15-173:5; Exhibit 17, Declaration of Jelani Coleman).

30. Plaintiff Celia Colon complained that she was discriminated against and harassed when, among other things:
    a. She was given a different work assignment;
    b. She was assigned to work in the Pilsen area on the basis of her race;
    c. She was assigned to work with other Spanish-speakers on the basis of her race;
    d. She was denied the opportunity to work out of a safer office;
    e. She was sent to work at an office with wi-fi that did not regularly work;
    f. She was sent to work at an office in an unsafe location;
    g. Her complaints about the unreliable wi-fi were ignored;
    h. Her complaints about the safety of the office were ignored;
    i. In response to complaints about her safety she was told that the campaign's numbers were more important;
    j. She was herded into a group at "cultural sensitivity" training and told not to say "anything stupid"
    k. She was micromanaged by her supervisors;
    l. She was not allowed to telecommute to work;
    m. She was told by her supervisor that the candidate would not visit them because it was not safe;
    n. She was placed in an office that had less modern equipment than the other campaign offices;
    o. She was not provided with the resources she needed to complete her work;
    p. She was made to check in hourly;
    q. She was told that the work that they were doing was not enough even though their group was high performing;
    r. She was suspended pending investigation for alleged misconduct that did not occur;
    s. No investigation whatsoever took place regarding the investigation;
    t. She was banned from being on campaign property;
    u. She was not allowed to retrieve her personal belongings from campaign property;
    v. She was made to act as a mascot for the campaign at the Mexican day parade;
    w. Her complaints to upper management were ignored and met with derision;
    x. The campaign's use of racial epithets at cultural sensitivity training; and
    y. She was intentionally denied the opportunity to speak after cultural sensitivity training.

(Exhibit 4, Deposition of Celia Colon, pp. 53:5-20, 55:5-56:2, 65:23-66:5, 66:11-23, 74:11-14, 74:15-75:22, 78:7-21, 81:2-82:19, 85:14-22, 87:12-24, 88:21-89:5, 90:11-91:5, 94:14-20, 97:23-102:18, 104:2-106:19, 111:3-111:24, 113:8-114:3, 122:15-22, 123:14-124:3, 129:11-132:10, 133:21-134:6, 137:6-12, 138:12-139:9, 143:22-144:6, 180:2-24, 204:9-15, 205:1-15, 205:1-15, 210:9-211:11, 217:20-218:5, 218:9-13)

31. Plaintiff Erica Kimble complained that she was discriminated against and harassed when:
    a. Placed on the Far Southside in a pre-dominantly African-American area only because she is African-American.
    b. The neighborhood of the Far Southside office was a very unsafe area. While canvassing Erica was often harassed by citizens and many times mistaken for a prostitute. The neighborhood was so dangerous that Erica did not feel safe enough to walk on her own or stay in the office late alone.
    c. The Far Southside office was in poor condition, unclean and unsafe. The office had asbestos tiles that were peeling, fixtures hanging from the wall that caused injuries, the plumbing was horrible and the Wifi was horrible.
    d. Erica was constantly bullied by other field organizers and her several complaints to her supervisor were ignored.
    e. Erica was denied the request to work from home while non-minority field organizers in other regions could work from home often.
    f. Caitlin Pharo took too long to reach out to Erica about her complaints and then after reaching out, Caitlin Pharo attempted to minimize the feelings of Erica.
    g. Even though Erica began complaining about discrimination and harassment in June, she was not transferred until October.
    h. Because she is African-American Erica was transferred to another pre-dominantly African-American region.
    i. The neighborhood of the Southside office was also dangerous with criminal activity in the parking lot that included drug transactions and gun shots.
    j. The Southside office was also in horrible condition.
    k. Erica was not allowed to work remotely.
    l. Erica was not allowed to apply for supervisory positions as she was actively told not to apply for supervisory positions.
    m. The candidate failed to make himself available to the Southside business owners and community.
    n. Erica was told not to ask questions at the "cultural sensitivity" training and when she tried anyway, she was ignored.

    o. Erica was deeply offended by the word "wetback" being used at the training.

(Exhibit 6, Deposition of Erica Kimble, pp. 115: 7-13, 203: 8-17, 109: 24, 112: 13-24, 113: 1-8, 272: 13-24, 273: 1-22, 52: 1-18, 155: 1-24, 156: 1-8, 170: 10-14, 171: 1-13, 175: 1-24, 177: 1-24, 178: 1-11, 183: 13-24, 190: 1-5, 138: 7-9, 138: 12-19, 195: 1-17, 197: 10-24, 283: 9-24, 284: 1-24, 285: 1-24, 286: 1-24, 287: 1-15, 126: 1-24, 129-131, 207: 1-8, 207: 14-16, 207: 17-24, 208: 1-8, 213: 11-24, 214: 1-4, 214: 1-20).

32. Plaintiff Nathaniel Madison complained that he was discriminated against and harassed when:
    a. Failed to provide him with supporter housing;
    b. Locked him out of VAN;
    c. Ignored his concerns about the safety of the office;
    d. Ignored his concerns about the safety of the turf he was assigned to work;
    e. Placed him in the turf he was supposed to work because of his race;
    f. Placed him in the office he was supposed to work because of his race;
    g. Used racial epithets to describe Latinos;
    h. Placed him in an office without working wi-fi;
    i. Placed him in an office with defects, such as a leaky ceiling;
    j. His supervisor micromanaged him;
    k. His supervisor repeatedly told him that the work he was doing was not up to par despite meeting his numbers;
    l. His supervisor intimidated him into staying silent at the cultural sensitivity training;
    m. Upper management intimidated him at the cultural sensitivity training;
    n. Upper management ignored the complaints that he and his co-workers had been giving to their supervisor;
    o. Was denied access to the candidate;
    p. Was told that the area where he worked was not secure enough for the candidate but he was still expected to work there;
    q. Supervisor refused to allow him to work remotely; and
    r. Supervisor made him check in hourly.

(Exhibit 7, Deposition of Nathaniel Madison, pp. 61:13-23, 70:2-11, 73:12-17, 75:17-76:1, 77:18-78:5, 79:21-80:14, 86:22-87:5, 96:11-17, 96:22-97:6, 101:21-103:3, 106:14-107:8, 108:7-24, 114:8-24, 125:3-17, 168:8-15, 170:12-171:1; Exhibit 18, Declaration of Nathaniel Madison).

33. Plaintiff Tiffany Madison complained that she was discriminated against and harassed when:
    a. Even though Tiffany came in from out of state she was placed in a predominantly African-American portion of the city because she is African-American.
    b. The Southside office was in disrepair-leaking ceilings, roaches and rats. While other non-minority-based offices were on college campuses and they were also given the opportunity to work from home while Tiffany was not allowed to work from home.
    c. The Southside office neighborhood was dangerous. Tiffany remembered a car was broken into and they often received calls that the police were outside their office.
    d. After Tiffany was transferred due to being sexually harassed by her supervisor she was moved to another predominantly African-American portion of the city because she is African-American.
    e. The Westside office was also in horrible condition and in a horrible neighborhood.
    f. Tiffany was not allowed to be promoted within the campaign. Even though Tiffany was the only person to apply for a supervisory position according to another supervisor, she still did not receive the position even though she is highly qualified.
    g. Tiffany was told at a Campaign event by a non-minority Campaign employee that in essence- African-Americans stereotypically leave events early, also inferring that African-Americans are lazy and want to avoid work. At this same event Tiffany and another African-American field organizer were told to hold the banner during a parade in a pre-dominantly African-American area of Chicago.
    h. At the "cultural sensitivity" training Tiffany watched Anne Capara degrade and dismiss the valid suggestion of a fellow field organizer, Celia Colon.
    i. On the first day of "cultural sensitivity" training Tiffany also saw field organizers from the minority regions lodge complaint after complaint and given no relief. Tiffany also noticed that none of the non-minority regions lodged similar complaints.
    j. Tiffany complained directly to the Campaign Manager, Quentin Fulks and explained the racial discrimination she was experiencing in her region. Quentin Fulks did nothing to help Tiffany.
    k. Tiffany was told not to "get up and say anything stupid" at the "cultural sensitivity" training during a break while all of the other regions enjoyed their break during training.

    l. During the training, the racial slur-wetback was used to describe Latinos.

    m. After not getting a direct invitation to be on call with Anne Capara after a formal complaint was filed for the demeaning treatment at the "cultural sensitivity" training, Tiffany happened on the call and heard Anne Capra intimidate everyone.

    n. No one in Campaign properly followed up with Tiffany after a supervisor sexually harassed her during her first couple of weeks with the Campaign.

    o. Noticing Stratton and Pritzker never visited the Westside Office. When Tiffany complained of this fact to her supervisor, DeJuan Jackson he stated when this fact was mentioned to "higher ups" in the Campaign it was joked that he[Pritzker] would come when they stop shooting.

    p. Tiffany noticed the Campaign did not care about quality interaction with the community of the Westside and the candidate but only wanted pictures for social media.

    q. Tiffany met with Quentin Fulks after being told not to "get up and say anything stupid" and complained about this issue and as well as other. Quentin Fulks did noting to help her and furthermore confronted Tiffany with personal text messages between her and fired former supervisor Raynal Sands who sexual harassed Tiffany.

(Exhibit 8, Deposition of Tiffany Madison, pp. 45: 18-24, 136: 1-7, 110: 6-7, 109: 20-23, 57: 5-20, 82: 4-13, 83: 11-24, 84:1-3, 110: 9-17, 112: 19-24, 113: 1-13, 50: 11-17, 54: 15-20, 51: 22-24, 183: 3-5, 184: 3-12, 172: 4-24, 173: 1-18, 170: 1-16, 142: 15-24, 143: 1-17, 67: 19-24, 68: 1-7, 69: 23-24, 70: 1-4, 78: 11-24, 79: 1-10, 71: 5-16, 90: 24, 91: 1-5, 92: 6-24, 102: 21-24, 103: 1-3, 87: 5-8, 87: 23-24, 88:1, 97: 1-2, 6-23, 135: 23-24, 109: 12-24, 110-113).

34.   Plaintiff James Tinsley complained that he was discriminated against and harassed when:

    a. His Regional Field Director Steven Oaks contacted him incessantly to question him about his job performance but does not contact his non-minority fellow field organizers in the same fashion.

    b. The only job performance that Steven Oaks contacted James about was metrics that are based heavily on partnering with other campaigns in the region. Yet Steven Oaks and later Priyanka Khanna did not allow James to use his political connections and savvy in the region to build relationships with other campaigns to raise the metric desired by Steven Oaks.

    c. Constantly harassed by Jessica Anacker, the GOTV Director in this region. Jessica Anacker would listen to phone calls, steal his ideas, show up for

      meetings set up by James, constantly give him unnecessary instruction and attempt to embarrass him in public. When James complained of the microaggressions to Steven Oaks and Priyanka Khanna absolutely nothing was done.

    d. He was called close to midnight the night before his long-scheduled day off and told by Steven Oaks to "round up 40 Black males" for a mystery event. While neither of his non-minority field organizer colleagues were asked to get anyone to this event.

    e. Allison Flood, who was a Political Director for the Campaign and a current employee of the Governor's Office, told James that Newport is an acronym for "niggers either working, pimping or running things".

    f. James did not report Allison Flood for hear of losing his job.

    g. James observed Campaign "higher up" treat fellow minority Field Organizer Celia Colon, in a demeaning matter when she made a valid suggested during "cultural sensitivity" training.

    h. James felt silenced at the "cultural sensitivity" training and could not express his true feelings about the discrimination he was experiencing during the Campaign.

    i. James was forced to jump into a dumpster to find a piece of paper by his supervisor Gabriella Cascone in front of his three-year-old son.

    j. James did not get an exit interview and did not get a chance to apply for positions in Pritzker's administration or for other governmental positions.

(Exhibit 9, Deposition of James Tinsley, pp. 38: 17-21, 46: 22-24, 47: 1-16, 52: 20-24, 53: 1-8, 54: 1-7, 60-61, 66: 18-24, 67: 1-5, 73: 12-23, 96: 15-23, 73-75, 98: 10-19, 141: 5-9, 96: 10-12, 205: 16-23, 123: 1-24, 124: 1-11.  173-175, 81: 19-24, 80: 1-24, 86: 6-24, 110-111: 1-17, 201: 14-24, 202: 1-4, 202-203:1, 201: 2-13, 113: 1-6, 120: 5-16, 119: 1-24, 200: 1-13, 100-101: 1-14, 152: 14-24, 153: 1-5).

35.   Plaintiff Mark Walker complained that he was discriminated against and harassed when:
    a. Given his job assignment on the basis of his race;
    b. Assigned to an office that was unclean and unsanitary;
    c. Assigned to an office that was in an unsafe location;
    d. Assigned to an office that
    e. Given materials from the campaign that only contained African Americans;
    f. Given less resources than his white counterparts;
    g. Indefinitely suspended pending an investigation that never occurred;
    h. Barred from campaign property;
    i. Harassed before cultural sensitivity training;

    j. Made an example of during cultural sensitivity training by the trainer;
    k. The cultural sensitivity trainer used racial epithets;
    l. Ignored his concerns about the safety of the office;
    m. Ignored his concerns about the safety of the turf he was assigned to work;
    n. Used racial epithets to describe Latinos;
    o. Placed him in an office without working wi-fi;
    p. Placed him in an office with defects, such as a leaky ceiling;
    q. His supervisor micromanaged him;
    r. His supervisor repeatedly told him that the work he was doing was not up to par despite meeting his numbers;
    s. His supervisor intimidated him into staying silent at the cultural sensitivity training;
    t. Upper management ignored the complaints that he and his co-workers had been giving to their supervisor;
    u. Was denied access to the candidate;
    v. Was told that the area where he worked was not secure enough for the candidate but he was still expected to work there;
    w. Supervisor refused to allow him to work remotely; and
    x. Supervisor made him check in hourly.

(Exhibit 10, Deposition of Mark Walker, pp. 71:11-19, 73:12-24, 75:22-76:11, 76:22-77:10, 81:10-18, 83:18-85:13, 89:17-24, 103:23-104:15, 105:5-17, 112:7-20, 155:15-156:22, 160:1-23, 162:14-166:20, 169:2-12, 172:23-173:1, 174:21-175:18, 181:19-182:19, 192:1-192:

36. Plaintiff Kayla Hogan complained that she was discriminated against and harassed when:
    a. Upon being hired Kayla is told by her direct supervisor Richard Merritt that her "target demographic" was African-American women.
    b. Having her myriad of complaints completely ignored for an extended period of time while noticing non-minority field organizers having issues resolved. In addition, Kayla requested via Richard Merritt to speak with JB Pritzker or upper management about racial discrimination she observed and was completely ignored.
    c. Kayla was micromanaged by her supervisor Richard Merritt.
    d. Kayla did not receive campaign supplies in a timely fashion and every facet of her work was scrutinized unfairly while her non-minority counterparts had no such issues.
    e. Safety concerns at the region campaign office were ignored and not resolved.
    f. Kayla's region received no praise from headquarters or their direct supervisors.

    g. Kayla's region was constantly excluded from any event where there was a chance to meet the Governor, Lieutenant Governor or if a large press presence was expected.
    h. Neither Pritzker nor Stratton would appear at Kayla's region office to meet voters while they would visit other non-predominantly minority region's office.
    i. Non-minority field organizers were given more responsibility and better jobs.
    j. Kayla discussed started union for the field organizers with other field organizers on the Campaign but fear of being fired ended the discussions.
    k. Kayla was completely ignored when she asked about having a cultural sensitivity training in the future during a sexual harassment training.
    l. Kayla tried to speak to Juliana Stratton after another racially charged discussion but was told to call her assistant.
    m. Kayla explained all of the racial discrimination and harassment occurring to her within the Campaign to Stratton's assistant for almost two hours. Kayla never heard from Stratton.
    n. Caitlin Pharo did not lay out a clear plan of action for Kayla to help her resolve her discrimination and harassment.
    o. After finally speaking with Caitlin Pharo, Kayla was transferred then demoted then fired.

(Exhibit 11, Deposition of Kayla Hogan, pp. 76: 3-16, 77: 5-17, 82: 8-10, 82: 17-20, 82: 24, 83: 1-5, 83: 15-24, 84: 1-15, 90: 1-24, 94: 14-16, 96: 23-24, 97: 1-3, 105: 1-12. 127: 1-11, 124: 17-24, 125: 1-6, 125: 1-6, 127: 14-24, 128: 1-5, 216: 23-24, 217-218: 1-6, 130: 1-7, 135: 1-17, 223: 13-24, 224: 1-22, 226: 8-10, 47: 1-4, 44: 19-24, 45: 1-4, 52: 1-21, 53: 1-21, 58: 1-24, 59: 1-8, 220: 17-24, 221: 1-17, 123: 6-12, 181: 1-11, 181: 17-24, 182: 17-23).

37.     Plaintiff Eric Chaney complained that he was discriminated against and harassed when, among other things:
    a. His supervisor called him racial epithets;
    b. His supervisor called him derogatory and curse words;
    c. His supervisor called his co-workers racial epithets;
    d. His supervisor called his co-workers derogatory and curse words;
    e. His supervisor used abusive language against him and his co-workers in front of upper management but was not disciplined;
    f. He complained to upper management about his supervisor's abusive and derogatory language, but his supervisor was not disciplined;

g. He was forced to divulge private information related to his complaints in a public setting;
h. He was forced to discuss HR and performance issues in public settings were anyone could overhear;
i. He was transferred in retaliation for telling his supervisor not to use abusive and demeaning language against him;
j. He was told he could not work the Northside of Chicago because there were no openings even though there were;
k. He was told that his work performance was substandard even though it was comparable to his white counterparts;
l. He was demeaned for not making calls as quickly as other organizers even though he had a physical disability that inhibited his ability to hear as well as others;
m. His supervisor posted demeaning and unflattering pictures of him online;
n. His supervisor made him reveal personal health information, such as that he suffers from body dysmorphia, in front of others;
o. His supervisor refused to provide him with information on how to file a complaint or to get into contact with HR;
p. The campaign did not provide field organizers with adequate information on how to contact HR;
q. Fulks yelled and verbally harassed him over the phone;
r. He was made to work in an unsafe office location;
s. Over objections by him and other field organizers, the campaign placed the southside field office in an unsafe location;
t. He was made to work in an office that was not clean;
u. He was transferred to an office that was unsafe and not clean;
v. He was locked out of the campaign's system and stopped receiving specific communications from the campaign, thus barring him from working;
w. He worked in an office that was not properly equipped;
x. He was given literature that targeted only Black Americans to use at work;
y. He was told by his supervisor that he would judge them extra harshly because of his race;
z. Constantly belittled for his work performance even when he went above and beyond what was required;
aa. He was discouraged from organizing white neighborhoods within his assigned turf; and
bb. He was assigned only Black people to call, regardless of their location in the city, but not white people (regardless of whether they lived in his turf).

(Exhibit 12, Deposition of Eric Chaney, pp. 42:23-43:7, 44:13-19, 49:1-23, 49:24-50:6, 52:12-19, 53:20-54:3, 54:19-55:2, 56:12-57:10, 59:12-16, 60:1-24, 61:8-22, 63:5-22, 65:13-24, 67:16-68:10, 72:16-73:20, 79:7-80:15, 83:15-23, 89:3-90:6, 93:12-23, 95:3-15, 98:1-17, 96:10-97:6, 102:12-18, 102:22-103:10, 123:24-124:13, 127:13-18, 134:12-135:20, 137:22-139:22, 148:5-14, 153:1-156:4, 158:5-15, 162:24-163:22, 163:23-164:3, 182:10-22, 189:12-23, 192:9-193:3, 194:20-195:6, 196:14-22, 197:11-21, 200:10-19, 203:17-23, 205:10-206:10, 206:19-207:13).

38. The Campaign had no standard way to evaluate employee performance. (Exhibit 13, Campaign's 30(b)(6) Deposition, p. 112:16-18).

39. After Plaintiffs filed their lawsuit, their supervisors were contacted and asked to fill out paperwork documenting their work performance. (Exhibit 19, Deposition of Fidel Williams, p. 25:7-26:12; Fidel Williams Deposition Exhibit 1).

Dated: 30 December 2020

Respectfully Submitted,

**MAXWELL LITTLE, JASON BENTON, JELANI COLEMAN, CELIA COLON, KASMINE CALHOUN, ERICA KIMBLE, NATHANIEL MADISON, TIFFANY MADISON, JAMES B. TINSLEY, MARK WALKER, KAYLA HOGAN, and ERIC CHANEY**

By: /s/Jeanette Samuels
*One of Plaintiff's Attorneys*

Jeanette Samuels
SHILLER PREYAR JARARD & SAMUELS
601 South California Avenue
Chicago, Illinois 60612
T: 312-226-4590
F: 773-346-1221
E: sam@spjslaw.com