## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MAXWELL LITTLE, *et al.*,

  *Plaintiffs*,

  v.

JB PRITZKER FOR GOVERNOR, *et al.*,

  *Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)

No. 18 C 6954

Judge Virginia M. Kendall

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs—Maxwell Little and eleven other Field Organizers of the JB Pritzker for Governor campaign—filed suit against Defendants JB Pritzker for Governor, the campaign organization (the "Campaign"), Juliana Stratton, and Caitlin Pharo for harassment and discrimination which allegedly occurred when they were employed by the Campaign and for defamation under Illinois law. (Dkt. 28). Before the Court are Defendants' Motions for Summary Judgment on all causes of action and Plaintiffs' Motion for Summary Judgment as to § 1981 discrimination. (Dkt. 133; Dkt. 135; Dkt. 137; Dkt. 139; Dkt. 141; Dkt. 143; Dkt. 145; Dkt. 147; Dkt. 149; Dkt. 151; Dkt. 153; Dkt. 155; Dkt. 164). For the following reasons, Defendants' Motions for Summary Judgment are granted. Plaintiffs' Motion for Summary Judgment is denied.

## BACKGROUND

### I.      Evidentiary and Local Rule 56.1 Compliance

As a preliminary matter, all of Plaintiffs' briefing suffers several Local Rule 56.1 violations which significantly hampered review and adjudication of the motions. "The district court's discretion to require strict compliance with Local Rule 56.1 has been upheld time and again" by the Seventh Circuit. *Boss v. Castro*, 816 F.3d 910, 914 (7th Cir. 2016); *see also Igasaki v. Illinois Dep't of Fin. and Prof'l Regulation*, 988 F.3d 948, 956 (7th Cir. 2021) (citing *Stevo v. Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings.")).

First, Plaintiffs' statement of additional facts is, in the spirit of brevity, too long. (Dkt. 195). "An opposing party's LR 56.1(b)(3) statement[] of additional facts must not exceed 40 numbered paragraphs. A party must seek the court's permission before exceeding these limits." LR 56.1(d)(5). On its face, Plaintiffs' statement of additional facts totals 39 numbered paragraphs; that number obscures a violation of remarkable proportion. (Dkt. 195). Twelve of these paragraphs state "Plaintiff . . . complained that he was discriminated against and harassed when, among other things" followed by as many as 28 separate subparagraphs. (Dkt. 195 ¶¶ 26–37). Each of these subparagraphs is substantive and, in its own right, a statement of additional fact more appropriate to its own, separate paragraph. Including these

subparagraphs, Plaintiffs' statement of additional facts totals a whopping 251 paragraphs—more than 6 times the limit afforded under Local Rule 56.1. Plaintiffs failed to seek leave (likely to have been granted) to exceed their 40-paragraph limit, and therefore the Court would be well within its discretion to simply strike every fact beyond the 40 permitted by the rule. ¶ 26.n. (Dkt. 195); *see Perez v. Bd. of Educ. of the City of Chicago*, 576 Fed. Appx. 615, 617 (7th Cir. 2014) (upholding district court's decision to strike additional facts which "significantly exceeded the 40-paragraph limit"); *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014) (same). Yet, the vast majority of Plaintiffs' statements of additional facts fail on other grounds, and so the Court declines to exercise its discretion to strike them for that violation.

Second, at multiple points in their Local Rule 56.1(b) response to Defendants' Local Rule 56.1 statement, Plaintiffs wholly fail to respond to a given fact. (Dkt. 194 ¶¶ 36–37, 52). The entire purpose of the exercise outlined in the rule is to aid the Court in determining whether an issue of material fact exists such that ruling as a matter of law is inappropriate. By failing to respond, Plaintiffs foisted their work upon the Court, leaving the Court in the position of searching for the answers within the record, something district court judges are not required to do. Responses under Local Rule 56.1(b) "must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." LR 56.1(e)(2). "[F]ailure to admit or deny facts presented in the moving party's statement . . . render the facts presented by the moving party as undisputed." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218–19 (7th Cir. 2015) (citing *Ammons v. Aramark Unif. Servs.*, 368 F.3d 809, 818

(7th Cir. 2004)); *see also Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

Third, in Plaintiffs' Local Rule 56.1(b) response to Defendants Local Rule 56.1 statement, their Local Rule 56.1(b)(3) statement of additional facts, and their Local Rule 56.1(c)(2) response to Defendants' statement of additional facts, Plaintiffs frequently fail to provide a record citation to support their denials. (Dkt. 194 ¶¶ 7, 32–33, 42–43, 46–51, 53, 55–56; Dkt. 195 ¶ 17; Dkt. 216 ¶¶ 4, 20).[1] When disputing an asserted fact, "a party must cite specific evidentiary material that controverts the fact . . . Asserted facts may be deemed admitted if not contravened with specific citations to evidentiary material." LR 56.1(e)(3), 56.1(d)(2); *see also Curtis*, 807 F.3d at 218 (citing *Ammons*, 368 F.3d at 818–19); *Perez*, 576 Fed. Appx. at 616 (upholding district court's decision to strike responses to movant's statement of facts which "do not cite anything in support"). Where Defendants' factual assertion is supported by their record citation, and where Plaintiffs' denial is unaccompanied by a record citation, Plaintiffs' response is stricken. *See Bilal v. Rotec Indus., Inc.*, 326 Fed. Appx. 949, 956 (7th Cir. 2009) (citing *Cracco*, 559 F.3d at 632) ("We have consistently . . . held that district courts are not obligated to go beyond parties' Rule 56.1 statements by conducting their own investigation of the record.").

---

[1] It bears noting that, in addition to other enumerated shortcomings, Plaintiffs' statement of additional facts did not associate a record citation to individual subparagraphs and, instead, lumped all record citations together in an undifferentiated morass with no consistent, discernable organization. (Dkt. 195 ¶¶ 26–37). Further, Plaintiffs occasionally referenced portions of deposition testimony absent from the attached exhibits. (*Compare* Dkt. 195 ¶ 31 *with* Dkt. 196-6). In addition to violating Local Rule 56.1(d)(2), Plaintiffs substantially added to the Court's already heavy burden. LR 56.1(d)(2) ("Each asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it.").

4

Fourth, Plaintiffs cited, but did not file, Jessica Montgomery's Complaint in their Local Rule 56.1 statement. (Dkt. 166 ¶¶ 39–40). Local Rule 56.1(d)(3) requires "all evidentiary material identified in LR 56.1(a)(2) . . . be included as numbered exhibits with the statement of fact." LR 56.1(d)(3). Plaintiffs' footnote that the Jessica Montgomery Complaint "was marked confidential and so it has not been filed" does not obviate their duty to support factual assertions with evidence, particularly as Plaintiffs could have sought leave to file that particular exhibit under seal. (Dkt. 116-15 at 2). The relevant portions of Plaintiffs' Local Rule 56.1 statement are stricken.

Fifth, even where Plaintiffs did cite the record, in many instances that record citation did not support the factual assertion.[2] Plaintiffs either mischaracterized, drew tenuous and unsupported conclusions from, or omitted necessary context from the record. The Court will not consider these statements. *See, e.g., Bone Car Int'l, LLC v. Pentech Pharm., Inc.*, 741 F. Supp. 2d 854, 856 n. 1 (N.D. Ill. 2010) ("Where a party has offered a . . . statement of fact without offering proper evidentiary support, the Court will not consider that statement.").

Sixth, many of Plaintiffs' statements are inadmissible because the declarant lacks personal knowledge as required by Federal Rule of Evidence 602,[3] the evidence

---

[2] Dkt. 166 ¶¶ 19, 21, 26, 30, 39, 44–46, 48–50, 53; Dkt. 194 ¶¶ 19, 21, 25–26, 34, 39; Dkt. 195 ¶¶ 8–10, 15–16, 21, 23–25, 26.c, 26.e–j, 26.l–q, 27.b–c, 27.e–h, 27.j, 27.l, 28.d–i, 28.l, 29.a–b, 29.d–h, 29.j–k, 29.n–s, 29.v, 29.x–z, 30.a–c, 30.e, 30.g–i, 30.l–q, 30.s, 30.u–w, 31.a, 31.c–e, 31.g–i, 31.l, 31.n, 32.a, 32.c–h, 32.k, 32.n, 32.q–r, 33.d, 33.f–i, 33.m, 33.p, 34.a–d, 34.g–i, 35.a, 35.e, 35.f–j, 35.l–m, 35.o, 35.r–x, 36.b, 36.d–o, 37.b–c, 37.e, 37.g–h, 37.k–o, 37.q, 37.x–bb, 38–39; Dkt. 216 ¶¶ 12–13, 25–27, 29–30, 32, 38.

[3] *See* Dkt. 166 ¶¶ 14–15, 27–29, 31–33, 43, 46–47; Dkt. 195 ¶¶ 19–20, 26.k, 27.e–f, 27.i, 28.c, 29.l–m, 29.t, 30.d, 30.h–i, 30.m, 30.y, 31.b, 31.m, 32.b, 32.o–p, 33.b, 33.o, 34.d, 35.a, 35.f, 36.g–j, 37.f, 37.j–k, 39.

constitutes an improper lay opinion under Rule 701,[4] the statement is hearsay under Rule 802,[5] the evidence has not been properly authenticated under Rule 901,[6] or the evidence violates the best evidence rule under Rule 1002.[7]  On summary judgment, courts may only consider evidence that would be admissible at trial.  *Steffek v. Client Servs., Inc.*, 948 F.3d 761, 769 (7th Cir. 2020); *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").  Consequently, the Court will not consider Plaintiffs' statements of fact bolstered by inadmissible evidence.  *See Cariel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (courts may not consider inadmissible hearsay at summary judgment); *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014) ("[A] plaintiff seeking to thwart summary judgment must comply with . . . Federal Rule of Evidence 602, . . . which require[s] that testimony be based on personal knowledge.  Personal knowledge can include reasonable inferences, but it does not include speculating as to an employer's state of mind, or other intuitions, hunches, or rumors.")); *see, e.g., Alvares v. Bd. of Educ. of the City of Chicago*, No. 18 CV 5201, 2021 WL 1853220, at *2–3 (N.D. Ill. May 10, 2021) (declining to consider improperly authenticated evidence at summary judgment); *Echo, Inc. v. Timberland Machs. & Irr., Inc.*, No. 08 C 7123, 2011 WL 148396, at *3 (N.D. Ill. Jan. 18, 2011) (striking evidence based on improper lay opinion); *Kasalo v.*

---

[4] *See* Dkt. 195 ¶¶ 27.a–b, 27.d, 27.g, 28.b, 28.i, 29.c, 29.h–i, 29.q–r, 30.f, 30.k, 31.b, 31.f, 31.j, 32.j, 32.l–m, 33.b–c, 33.e–f, 33.m, 33.p, 35.b–c, 35.q, 36.c, 37.i, 37.p, 37.r–u, 37.w.

[5] *See* Dkt. 166 ¶¶ 13–15, 42, 44, 50; Dkt. 195 ¶¶ 18–20, 24, 26.a, 26.k, 30.m, 33.o, 36.a.

[6] *See* Dkt. 166 ¶¶ 38, 55.

[7] *See* Dkt. 195 ¶¶ 19–20, 24, 26.i.

*NCSPLUS Inc.*, No. 10 C. 1643, 2011 WL 2582195, at *1 (N.D. Ill. Jun. 27, 2011) (declining to consider affidavit evidence which violated the best evidence rule at summary judgment).

Seventh, a handful of Plaintiffs' statements and responses are vague, imprecise, or incomplete. (Dkt. 166 ¶¶ 34–35, 40; Dkt. 195 ¶ 35.d; Dkt. 216 ¶¶ 13, 16). By way of example, Plaintiffs' statement that "Jackson was following the chain of command and following authority" fails to specify or provide context illuminating with regard to what he was purportedly following the chain of command and authority. (Dkt. 166 ¶ 34). Plaintiffs' denial that "[a]n African American field organizer who was already in the Southside field office and fluent in Spanish was passed over for the position. Ms. Colon was picked because of her race[]" is an unresponsive *non sequitur* to Defendants' statement that "Ms. Colón's fluency in Spanish was a valuable asset for working in Region 6." (Dkt. 216 ¶ 16). Finally, Plaintiffs' assertion "Mark Walker complained that he was discriminated against and harassed when: . . . Assigned to an office that" is simply left unfinished. (Dkt. 195 ¶ 35.d). The Court is disinclined to scour the record to make sense of Plaintiffs' claims and allegations as "[j]udges are not like pigs, hunting for truffles buried in the record." *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004). Accordingly, the Court will not consider these statements. *See, e.g., Creative Trade Group, Inc. v. Int'l Trade Alliance, Inc.*, No. 08 C 2561, 2009 WL 3713345, at *6 (N.D. Ill. Nov. 4, 2009) (striking a party's vague and incomplete Local Rule 56.1 Response).

## II.      Factual Background

### A.      *The Campaign*

JB Pritzker for Governor of Illinois (the "Campaign") was a political campaign active between 2017 and November 6, 2018, supporting JB Pritzker's Illinois gubernatorial candidacy. (Dkt. 157 ¶¶ 2–3; Dkt. 194 ¶ 2; Dkt. 216 ¶ 40). The Campaign was active for both the March 20, 2018, primary election and the November 6, 2018, general election. (Dkt. 157 ¶ 18; Dkt. 194 ¶ 18). At its peak, the Campaign had 34 offices statewide and 200 employees, mostly Field Organizers. (Dkt. 157 ¶ 4; Dkt. 194 ¶ 4). After the primary election, the Campaign laid off 31 (mostly Caucasian) employees in order to operate more leanly until it ramped up efforts for the general election. (Dkt. 157 ¶¶ 27–28; Dkt. 174 ¶¶ 33–34; Dkt. 216 ¶ 33–34). Eric Chaney, Kayla Hogan, and Richard Merritt were among the 31 laid off. (Dkt. 157 ¶¶ 27–28; Dkt. 174 ¶¶ 33–34; Dkt. 216 ¶ 33–34).

In order to target potential voters, the Campaign divided Illinois into 15 geographical "regions," the boundaries of which are described below:

| Region | Geographic Area |
|---|---|
| Region 1 | Northern Chicago suburbs |
| Region 2 | Northside of Chicago |
| Region 3 | Northwest Chicago |
| Region 4 | Southside of Chicago |
| Region 5 | Westside of Chicago |
| Region 6 | Southside of Chicago |
| Region 7 | Far Southside of Chicago |
| Region 8 | Southern Chicago suburbs |
| Region 9 | Gurnee |
| Region 10 | Rockford |
| Region 11 | DuPage |
| Region 12 | Joliet |
| Region 13 | Peoria |

| Region 14 | Champaign |
|-----------|-----------|
| Region 15 | Springfield |

(Dkt. 157 ¶¶ 9–12; Dkt. 166 ¶ 12; Dkt. 174 ¶ 12; Dkt. 194 ¶¶ 9–12). Each region was then organized into "pods," each of which comprised several regions. Pod 4 comprised Region 5, Region 6, and Region 7. (Dkt. 157 ¶¶ 9, 11; Dkt. 194 ¶¶ 9, 11). Some areas of Illinois are populated by predominantly one race or ethnicity. (Dkt. 166 ¶ 22; Dkt. 174 ¶ 22). Peoria and Champaign-Urbana, for example, have predominantly Caucasian populations. (Dkt. 174 ¶ 28; Dkt. 216 ¶ 28).

In terms of personnel, JB Pritzker was the gubernatorial candidate and Julianna Stratton his running mate. (Dkt. 157 ¶ 2; Dkt. 194 ¶ 2). Stratton had no role in either hiring lower-level staffers or in assigning staffers to regions. (Dkt. 174 ¶ 39; Dkt. 216 ¶ 39). Anna Caprara served as the Campaign Manager and Quentin Fulks as the Deputy Campaign Manager. (Dkt. 157 ¶ 16; Dkt. 194 ¶ 16). Before joining the Campaign, Fulks had prior experience with other political organizations although he did not hold an express human resources position. (Dkt. 195 ¶ 4). Fulks supervised Manfred Mecoy, the Campaign's Election Director for both the primary and general election. (Dkt. 157 ¶¶ 15, 17; Dkt. 194 ¶¶ 15, 17). Mecoy, in turn, supervised both Emma Laurent, the Campaign's Field Director, and Caitlin Pharo, the Campaign's Field Operations Director. (Dkt. 157 ¶ 15; Dkt. 194 ¶ 15). Laurent was employed by the Campaign from January 2018 through shortly after November 6, 2018, and was responsible for supervising field directors, managing statewide field operations, and creating statewide get-out-the-vote plans for the primary election. (Dkt. 157 ¶ 15; Dkt. 166 ¶ 5–6; Dkt. 174 ¶¶ 5–6; Dkt. 194 ¶ 15). Pharo served as

9

Field Operations Director from January 2018 through November 2018 and was responsible for the operational aspects of the Campaign's field strategy, hiring logistics, the field and organizing program budget, and organizational procurement. (Dkt. 157 ¶ 16; Dkt. 166 ¶¶ 7–8; Dkt. 174 ¶¶ 7–8; Dkt. 194 ¶ 16). At her deposition, Pharo stated "[a]n office in a primarily African-American area would receive different [campaign literature] than an office in a primarily white area than an office in a primarily Spanish-speaking area." (Dkt. 166 ¶ 4; Dkt. 166-3 at 134:14–17). Pharo did not decide which individual lower-level staffers to hire nor where to assign those staffers. (Dkt. 174 ¶ 40; Dkt. 216 ¶ 40). Gabriella Cascone served as the Campaign's training director during the general election. (Dkt. 166 ¶ 24; Dkt. 174 ¶ 24).

Deputy Field Directors were responsible for supervising regional Field Directors. (Dkt. 157 ¶ 14; Dkt. 194 ¶ 14). Ebonee Dawson, an African-American Deputy Field Director during the general election, was responsible for Pod 4 and directly supervised DeJuan Jackson, Larry Bowden, Raynal Sands, and Joshua Doss. (Dkt. 157 ¶ 21.a–c, 22; Dkt. 166 ¶ 24; 174 ¶ 24; Dkt. 194 ¶ 22).

Field Directors were responsible for supervising several Field Organizers within a particular region. (Dkt. 157 ¶ 13; Dkt. 194 ¶ 13). Larry Bowden, Joshua Doss, Steven Oaks, and Zacharia Hartman each worked as Field Directors. (Dkt. 157 ¶¶ 21.a, 21.c, 21.g–h, 21.j). Bowden and Doss are African-American. Hartman and Oaks are Caucasian. (Dkt. 157 ¶ 22; Dkt. 194 ¶ 22). Richard Merritt is a former African-American Field Director laid off between the primary and general elections. (Dkt. 157 ¶¶ 21.k, 22, 31; Dkt. 194 ¶ 22). Raynal Sands, a former Field Director who

oversaw Region 6, was laid off on September 3, 2018, following sexual harassment allegations. (Dkt. 157 ¶¶ 21.c, 37; Dkt. 174 ¶ 9; Dkt. 216 ¶ 9). DeJuan Jackson, an African-American former Field Director, was employed by the Campaign from July 2017 through November 6, 2018. (Dkt. 157 ¶¶ 21.a, 22; Dkt. 166 ¶ 9; Dkt. 174 ¶ 9; Dkt. 194 ¶ 22). Jackson was responsible for Region 5 and supervised Maxwell Little, Jason Benton, Mark Walker, and Tiffany Madison. (Dkt. 166 ¶ 10; Dkt. 174 ¶¶ 10, 38; Dkt. 216 ¶ 38). Among Jackson's duties were sourcing potential job applicants, participating in hiring interviews, and making recommendations at the early stages of the hiring process. (Dkt. 174 ¶ 38; Dkt. 216 ¶ 38). Jackson had no independent hiring authority and did not decide where to place employees. (Dkt. 174 ¶ 38; Dkt. 216 ¶ 38).

Field Organizers were responsible for identifying supportive voters, turning them out to vote, recruiting and retaining volunteers, and garnering support among community stakeholders. (Dkt. 157 ¶ 8; Dkt. 194 ¶ 8). Each Field Organizer was responsible for a "turf," or a universe of targeted voters. (Dkt. 174 ¶ 2; Dkt. 216 ¶ 2). A Field Organizer's familiarity with a community or geographic location was helpful in achieving their objectives. (Dkt. 174 ¶ 3; Dkt. 216 ¶ 3). The racial composition of individual turfs was a product of the racial composition of the associated geographical area, not a decision by the Campaign to target voters by race. (Dkt. 174 ¶ 4; Dkt. 216 ¶ 4). The Campaign wanted its workforce to reflect Illinois in terms of diversity and, consequently, was dedicated to recruiting and hiring Field Organizers of diverse backgrounds and experiences. (Dkt. 166 ¶ 17; Dkt. 174 ¶ 17). The Campaign

collected demographic information voluntarily provided by applicants to ensure they hired diverse teams.  (Dkt. 166 ¶ 18; Dkt. 174 ¶ 18).  Once hired, the Campaign's Data Department provided information about voters which informed recommendations about where to place Field Organizers.  (Dkt. 166 ¶ 20; Dt. 174 ¶ 20).  The parties dispute whether the Data Department made recommendations regarding how many Field Organizers were needed per region and whether the Data Department had decision-making authority regarding hiring or placement.  (Dkt. 166 ¶ 20; Dkt. 174 ¶ 20).

Once hired, Field Organizers were provided the employee handbook and required to acknowledge in writing their receipt and review of it.  (Dkt. 157 ¶ 20; Dkt. 194 ¶ 20).  Each Plaintiff confirmed they received and reviewed the employee handbook.  (Dkt. 159-1 at 19, 21, 23, 25, 27, 29, 31, 33, 39, 41; Dkt. 194 ¶ 20).  The handbook includes an Equal Employment Opportunity Policy.  (Dkt. 195 ¶ 1).  The Campaign did not issue a separate written memo or guidance implementing this policy.  (Dkt. 195 ¶ 1).  The handbook also includes an anti-discrimination and anti-harassment policy which states "[a]ny manager who receives a complaint of possible discrimination, harassment, retaliation, must notify the Deputy Campaign Manager immediately."  (Dkt. 157 ¶ 23; Dkt. 195 ¶¶ 2, 23).  The Campaign had a zero-tolerance policy for prohibited discrimination and harassment.  (Dkt. 195 ¶ 11; Dkt. 215 ¶ 11).  According to Stratton's deposition testimony, referring to a subordinate using the term "nigger" would violate the employee handbook and result in termination.  (Dkt.

195 ¶ 13). The Campaign Manager and Deputy Campaign Manager did not formally demote employees on the basis of misconduct. (Dkt. 195 ¶ 12; Dkt. 215 ¶ 12).

Between February 2018 and November 2018, the Campaign maintained a dedicated HR department email address ("hr@") for employment-related concerns. (Dkt. 157 ¶ 19; Dkt. 218-18 at 7). Field staff were informed of the "hr@" email address via memo, verbally during all-staff meetings and trainings, and during new employee on-boarding. (Dkt. 195 ¶ 5; Dkt. 215 ¶ 5). Fulks and Caprara were responsible for investigating allegations of misconduct reported to them and, generally, issues of discrimination or harassment would be raised to Fulks. (Dkt. 195 ¶¶ 3, 7). As of January 2018, Pharo and Mecoy were also responsible for addressing HR issues. (Dkt. 195 ¶ 3). While Mecoy had access to the "hr@" account, primary monitoring responsibility fell to Pharo. (Dkt. 215 ¶ 7). Pharo frequently coordinated with others, often Mecoy and Fulks, to address issues raised to the "hr@" account. (Dkt. 215 ¶ 7). The Campaign documented serious allegations of misconduct but the decision whether to document minor allegations was discretionary. (Dkt. 196-13 at 36–39).

### B. *The Plaintiffs*

Plaintiffs are former Field Organizers for the Campaign.

#### 1. *Jason Benton*

Jason Benton is an African-American former Field Organizer hired by the Campaign on July 7, 2018, and assigned to Region 5. (Dkt. 157 ¶¶ 1.b, 5.5; Dkt. 194 ¶¶ 1.b, 5.b). The Region 5 office was the closest Campaign office the place of residence listed on his employment form. (Dkt. 174 ¶ 7; Dkt. 216 ¶ 7). Benton has no

knowledge of how the Campaign assigned Field Organizers to regions. (Dkt. 174 ¶ 7; Dkt. 216 ¶ 7). Benton alleges he experienced roaches and rodents, holes in the windows, leaky ceilings, plumbing issues, and smelly carpets at the Region 5 office although Defendants dispute this. (Dkt. 195 ¶ 28.a; Dkt. 215 ¶ 28.a). Benton was supervised by Jackson between June 7, 2018, and September 2018 and by Bowden between September 2018 and November 30, 2018, Benton's last date of employment. (Dkt. 157 ¶¶ 21.b, 58; Dkt. 194 ¶ 58). The Campaign documented performance issues with Benton during his employment. (Dkt. 157 ¶ 32).

### 2. *Kasmine Calhoun*

Kasmine Calhoun is an African-American former Field Organizer hired by the Campaign on September 4, 2018, and assigned to Region 13. (Dkt. 157 ¶¶ 1.e, 5.e; Dkt. 194 ¶¶ 1.e, 5.e). Calhoun was the only employee assigned to the Peoria office during her employment. Calhoun discussed with Hartman, her supervisor, that the organizer previously assigned to the office was an African-American woman. (Dkt. 195 ¶¶ 26.b, 26.e; Dkt. 215 ¶¶ 26.b, 26.e). Calhoun had difficulty securing housing. While the Campaign initially identified a family willing to voluntarily provide housing for her, the family ultimately did not do so. (Dkt. 157 ¶ 33). Between September 3, 2018, and September 12, 2108, the Campaign provided Calhoun housing at either a Peoria-based hotel or with a local Democratic Party supporter. (Dkt. 157 ¶ 34). From September 12, 2018, through November 6, 2018, the Campaign located housing for Calhoun with a supporter named "Helen." (Dkt. 157 ¶ 35; Dkt. 194 ¶ 35). On September 13, 2018, Calhoun voluntarily resigned and, during her exit

14

interview, was offered a position to return as a Field Officer either in Peoria or Chicago which she rejected.  (Dkt. 157 ¶¶ 42–43; Dkt. 174 ¶ 35; Dkt. 216 ¶ 35).

### 3.  *Eric Chaney*

Eric Chaney is an African-American hired by the Campaign as a Field Organizer in Region 4 on August 24, 2017.  (Dkt. 157 ¶¶ 1.l, 5.l; Dkt. 194 ¶ 1.l, 5.l).  The Region 4 office was located approximately 15 miles away from the place of residence Chaney listed on his employment forms.  (Dkt. 174 ¶ 30; Dkt. 216 ¶ 30).  Chaney asked to remain in this office rather than transfer to a different region.  (Dkt. 174 ¶ 30; Dkt. 216 ¶ 30).

For the majority of his employment by the Campaign, Chaney was supervised by Merritt, an African-American.  (Dkt. 157 ¶ 21.k).  At his deposition, Chaney testified that, on unspecified occasions, Merritt referred to him as a "niglet" and "nigga" and used profanity.  (Dkt. 195 ¶ 37.d; Dkt. 195-12 at 56:21–57:10, 59:7–24, 63:8–13, 65:3–24, 102:22–103:6; Dkt. 197 ¶ 37.a; Dkt. 215 ¶¶ 37.a, 37.d).  Chaney complained about Merritt's behavior to upper management.  (Dkt. 195 ¶ 37.f; Dkt. 215 ¶ 37.f).  Chaney expressed interest in being reassigned to the Northside office but was informed there were no openings at that time.  (Dkt. 195 ¶ 37.j; Dkt. 215 ¶ 37.j).  Chaney testified that, when discussing other options to work on the Campaign, Fulks yelled at him over the phone.  (Dkt. 195 ¶ 37.q; Dkt. 215 ¶ 37.q).

In January 2018, Chaney was one of seven Field Organizers reassigned to a new region.  (Dkt. 157 ¶ 24; Dkt. 194 ¶ 24).  Other than the first day of his reassignment, Chaney never reported to work in his new region.  (Dkt. 157 ¶ 25).

This was among several documented performance issues during Chaney's employment. (Dkt. 157 ¶ 32). In February 2018, the Campaign offered Chaney a severance package, which he declined. (Dkt. 157 ¶ 26). On March 25, 2018, Pharo informed Chaney he was being laid off. (Dkt. 157 ¶ 29; Dkt. 194 ¶ 29). Chaney's last day of employment with the Campaign was March 31, 2018. (Dkt. 157 ¶ 30; Dkt. 194 ¶ 30).

### 4.   *Jelani Coleman*

Jelani Coleman, an African-American, applied to work on the Campaign after previously working with Tiffany Madison and Benton. (Dkt. 174 ¶ 8; Dkt. 216 ¶ 8). Tiffany Madison informed Coleman she was working for the Campaign before Coleman applied. (Dkt. 174 ¶ 10; Dkt. 216 ¶ 10). Coleman understood Sands was interviewing him for a position in the office she supervised. (Dkt. 174 ¶ 9; Dkt. 216 ¶ 9). Coleman was hired by the Campaign on August 28, 2018, as a Field Organizer in Region 6. (Dkt. 157 ¶¶ 1.c, 5.c; Dkt. 194 ¶¶ 1.c, 5.c). Coleman has no personal knowledge about how Field Organizers are assigned to regions nor did he previously identify his regional assignment as something he considered discriminatory. (Dkt. 174 ¶ 12).

Coleman was supervised by Sands between August 28, 2018, and September 2018 and by Doss between September 2018 and November 30, 2018. (Dkt. 157 ¶¶ 21.c, 58; Dkt. 194 ¶ 58). On October 24, 2018, spurred by documented performance issues during his employment, Coleman was placed on administrative leave, which amounted to full salary and benefits pending an investigation into the

16

aforementioned performance issues. (Dkt. 157 ¶¶ 32, 56–57; Dkt. 194 ¶ 57). Coleman was terminated on November 30, 2018. (Dkt. 157 ¶ 58; Dkt. 194 ¶ 28).

### 5. *Celia Colón*

Celia Colón, a Latina fluent in Spanish, was hired by the Campaign as a Field Organizer on July 30, 2018, and assigned to Region 6. (Dkt. 157 ¶¶ 1.d, 5.d; Dkt. 194 ¶¶ 1.d, 5.d). When she applied, Colón did not express a preference for any particular region and knew her employment offer was for Region 6. (Dkt. 174 ¶ 15; Dkt. 216 ¶ 15). Colón's Spanish fluency was a valuable asset for working in Region 6. (Dkt. 174 ¶ 16; Dkt. 216 ¶ 16). Other than Region 6's office, located 10 miles away from Colón's home, only Region 7's office was located closer. (Dkt. 174 ¶¶ 13–14; Dkt. 216 ¶¶ 13–14). Colón participated in the Mexican Day parade with other Campaign employees. (Dkt. 195 ¶ 30.v; Dkt. 215 ¶ 30.v).

During her employment, Colón had many documented performance issues. (Dkt. 157 ¶ 32). On October 24, 2018, Campaign placed Colón on paid administrative leave, which amounted to full salary and benefits, pending an investigation into the aforementioned performance issues. (Dkt. 157 ¶¶ 52, 56–57; Dkt. 194 ¶ 57). During the time she was on administrative leave, Colón was not permitted on Campaign property. (Dkt. 195 ¶ 30.t; Dkt. 215 ¶ 30.t). Colón's last day of employment was November 30, 2018. (Dkt. 157 ¶ 58; Dkt. 194 ¶ 58).

### 6. *Kayla Hogan*

Kayla Hogan, an African-American, was hired by the Campaign as a Field Organizer and assigned to Region 4 on November 6, 2017. (Dkt. 157 ¶¶ 1.k, 5.k; Dkt.

194 ¶¶ 1.k, 5.k). The Region 4 office was located approximately 2.7 miles and 8 miles from the two places Hogan lived during the primary election. (Dkt. 174 ¶ 29; Dkt. 216 ¶ 29). Although Hogan did not want to be reassigned to a new region, she was among several Field Organizers reassigned in January 2018. (Dkt. 157 ¶ 24; Dkt. 174 ¶ 29; Dkt. 194 ¶ 24). Hogan had several documented performance issues during her employment by the Campaign, including failure to report to her new region other than the first day of her reassignment. (Dkt. 157 ¶¶ 25, 32). On March 25, 2018, Pharo informed Hogan she was being laid off. (Dkt. 157 ¶ 29; Dkt. 194 ¶ 29). Hogan's last day of employment was March 31, 2018. (Dkt. 157 ¶ 30; Dkt. 194 ¶ 30).

### 7. *Erica Kimble*

Erica Kimble is an African-American hired by the Campaign on June 7, 2018, as a Field Organizer assigned to Region 7. (Dkt. 157 ¶¶ 1.f, 5.f; Dkt. 194 ¶¶ 1.f, 5.f). Kimble knew, and did not object to, she was being interviewed for a position in the Region 7 office. (Dkt. 174 ¶ 22; Dkt. 216 ¶ 22). Kimble was subsequently transferred to Region 6 due to interpersonal issues with co-workers unrelated to her race. (Dkt. 174 ¶ 21; Dkt. 216 ¶ 21). The Region 6 and Region 7 offices, each located approximately 7.5 miles away from Kimble's home, were the closest Campaign offices to Kimble's home. (Dkt. 174 ¶ 21; Dkt. 216 ¶ 21). Kimble has no personal knowledge about how the Campaign placed Field Organizers. (Dkt. 174 ¶ 22; Dkt. 216 ¶ 22). Kimble had documented performance issues during her employment with the Campaign. (Dkt. 157 ¶ 32). On October 24, 2018, the Campaign placed Kimble on administrative leave, which amounted to full salary and benefits, pending

investigation into her performance issues. (Dkt. 157 ¶¶ 56–57; Dkt. 194 ¶ 57). Kimble's last date of employment was November 30, 2018. (Dkt. 157 ¶ 58; Dkt. 194 ¶ 58).

### 8. *Maxwell Little*

Maxwell Little, an African-American, was hired by the Campaign as a Field Organizer in Region 5 on July 30, 2018. (Dkt. 157 ¶¶ 1.a, 5.a; Dkt. 194 ¶¶ 1.a, 5.a). The Region 5 office was located approximately 14 miles away from the place of residence listed on Little's employment forms. (Dkt. 174 ¶ 5; Dkt. 216 ¶ 5). Only the Region 6 and Region 7 offices, both of which Plaintiffs contend are predominantly minority, were closer to Little's address. (Dkt. 174 ¶ 5; Dkt. 216 ¶ 5). Little has no knowledge about why the Campaign assigned him, or any other Field Organizer, to Region 5. (Dkt. 174 ¶ 6; Dkt. 216 ¶ 6). Little had documented performance issues during his employment by the Campaign. (Dkt. 157 ¶ 32). Little testified, although the parties dispute this point, that the Campaign picked only African-American Field Organizers to hold the Campaign banner at the Bud Billiken parade. (Dkt. 166 ¶ 55; Dkt. 174 ¶ 55). On October 4, 2018, Little emailed Bowden that he would be taking October 16–18, 2018, off for a family emergency. (Dkt. 157 ¶ 49). The Campaign placed Little on paid administrative leave, which amounted to full salary and benefits, pending investigation into performance issues. (Dkt. 157 ¶¶ 56–57; Dkt. 194 ¶ 57). Little's last day of employment was November 30, 2018. (Dkt. 157 ¶ 58; Dkt. 194 ¶ 58).

19

9.    *Nathaniel Madison*

Nathaniel Madison is an African-American hired by the Campaign on July 30, 2018, as a Field Organizer in Region 6.  (Dkt. 157 ¶¶ 1.g, 5.g; Dkt. 194 ¶¶ 1.g, 5.g). Nathaniel Madison's sister, Tiffany Madison, connected him to Sands to apply for a position in Region 6.  (Dkt. 157 ¶ 7; Dkt. 174 ¶ 19; Dkt. 194 ¶ 7; Dkt. 216 ¶ 7). Nathaniel Madison has no knowledge or information about how the Campaign assigned Field Organizers and never asked.  (Dkt. 174 ¶ 20; Dkt. 216 ¶ 20). Nathaniel Madison observed the ceiling of the Region 6 office leaked.  (Dkt. 195 ¶ 32.i; Dkt. 215 ¶ 32.i).  Nathaniel Madison's last day of employment was November 30, 2018.  (Dkt. 157 ¶ 58; Dkt. 194 ¶ 58).

10.    *Tiffany Madison*

Tiffany Madison, an African-American, was hired by the Campaign as a Field Organizer in Region 6 on July 30, 2018.  (Dkt.  157 ¶¶ 1.h, 5.h; Dkt. 194 ¶ 2.h). Tiffany Madison submitted her resume directly to Sands whom she knew from working together on previous political campaigns.  (Dkt. 157 ¶ 6; Dkt. 174 ¶ 18; Dkt. 194 ¶ 6; Dkt. 216 ¶ 18).  Tiffany Madison contends, although the parties dispute this point, she was placed in a predominantly African-American area because she is African-American.  (Dkt. 195 ¶ 33.a; Dkt. 215 ¶ 33.a).  Tiffany Madison was asked to hold a banner in front of the Bud Billiken parade.  (Dkt. 195 ¶ 33.g; Dkt. 215 ¶ 33.g).

On September 2, 2018, Tiffany Madison emailed the Campaign HR account accusing Sands of sexual harassment.  (Dkt. 157 ¶ 36).  Pharo responded approximately a half-hour later and asked if Tiffany Madison would like to meet that

20

day. (Dkt. 157 ¶ 36). Tiffany Madison and Pharo met on September 3, 2018, to discuss the sexual harassment allegations and Sands was fired later that same day. (Dkt. 157 ¶¶ 21.e, 37). Tiffany Madison was transferred to Region 5. (Dkt. 157 ¶¶ 21.e, 37). Tiffany Madison voluntarily resigned from the Campaign on September 27, 2018. (Dkt. 157 ¶ 48; Dkt. 174 ¶ 36; Dkt. 216 ¶ 36).

      11.    *James Tinsley*

Tinsley James is an African-American hired by the Campaign on July 30, 2018, as a Field Organizer in Region 14. (Dkt. 157 ¶¶ 1.i, 5.i; Dkt. 194 ¶ 1.i, 5.i). Tinsley lived in Urbana, Illinois when he was hired by the Campaign. (Dkt. 174 ¶ 23; Dkt. 216 ¶ 23). Tinsley worked with two other Field Organizers in Region 14, Jake Hamilton and Eliza Glezer, both of whom are Caucasian. (Dkt. 174 ¶ 24; Dkt. 216 ¶ 24). The parties dispute several of Tinsley's allegations regarding his employment with the Campaign. First, that, on midnight before a scheduled day off, Oaks called Tinley and instructed him to round up 40 African-American men for an event the next day. (Dkt. 195 ¶ 34.d; Dkt. 215 ¶ 34.d). Second, that Allison Flood told him that "Newport" is an acronym for "niggers either working, pimping, or running things." (Dkt. 195 ¶ 34.e; Dkt. 195-9 at 110:21–111:1; Dkt. 215 ¶ 34.e). Third, that Cascone "made [him] hop in a dumpster" to retrieve documents recording results of doors Tinsley knocked on. (Dkt. 195 ¶ 34.i; Dkt. 195-9 at 101:4). Tinsley's last day of employment was November 30, 2018, and he did not receive a formal exit interview. (Dkt. 157 ¶ 58; Dkt. 194 ¶¶ 34.j, 58).

21

### 12. *Mark Walker*

Mark Walker, an African-American, was hired by the Campaign on July 30, 2018, as a Field Organizer in Region 5. (Dkt. 157 ¶¶ 1.j, 5.j; Dkt. 194 ¶¶ 1.j, 5.j). The Region 5 office was located about 11 miles away from Walker's home and Walker did not object to the location of his employment offer. (Dkt. 174 ¶ 25; Dkt. 216 ¶ 25). Upon his request, Walker was subsequently transferred to Region 6, the office for which was located fewer than two miles from his home. (Dkt. 157 ¶ 5.j; Dkt. 174 ¶ 26; Dkt. 194 ¶ 5.j; Dkt. 216 ¶ 26). Walker's home is located in a "predominantly African-American" neighborhood. (Dkt. 174 ¶ 26; Dkt. 216 ¶ 26). Walker does not know how the Campaign assigned Field Organizers. (Dkt. 174 ¶ 25; Dkt. 216 ¶ 25).

Walker had documented performance issues during his employment for the Campaign. (Dkt. 157 ¶ 32). Doss required Walker to report how many calls he made, how many doors he knocked on, and how many businesses he canvassed on a hourly basis. (Dkt. 195 ¶ 35.x; Dkt. 215 ¶ 35.x). On October 24, 2018, the Campaign placed Walker on paid administrative leave, which amounted to full salary and benefits, pending an investigation into his performance issues. (Dkt. 157 ¶¶ 56–57; Dkt. 194 ¶ 57). Walker's last day of employment was November 30, 2018. (Dkt. 157 ¶ 58; Dkt. 194 ¶ 58).

### C. *Cultural Sensitivity Training*

The Campaign held an all-staff single session of cultural sensitivity training on September 12, 2018. (Dkt. 157 ¶ 38; Dkt. 194 ¶ 38). Dawson gathered the staffers she supervised—Benton, Coleman, Colón, Kimble, Little, Nathaniel Madison, Tiffany

Madison, and Walker—to speak with them before the training began. (Dkt. 157 ¶ 39). The parties dispute whether Dawson instructed her staffers not to say "anything stupid." (Dkt. 215 ¶¶ 27.j, 28.j). During the training, Pharo sat next to Little and Jackson. (Dkt. 157 ¶ 40; Dkt. 194 ¶ 40).

The presenter at the training identified language, including some specific examples, unacceptable for use in the workplace regardless of speaker or context. (Dkt. 159 ¶ 97; Dkt. 195 ¶ 28.k). Additionally, the presenter showed a video of a well-known study in which viewers are told to focus on how many times a ball is passed by people in the foreground, causing viewers to "miss" that a person wearing a gorilla costume walks through the background of the video. (Dkt. 195 ¶ 29.u; Dkt. 215 ¶ 29.u). At the conclusion of the training, Fulks made himself available to answer questions. (Dkt. 157 ¶ 41; Dkt. 194 ¶ 41).

Little and Tiffany Madison emailed the Campaign on September 13, 2018, September 17, 2018, September 19, 2018, and September 21, 2018, with complaints about the training which the Campaign subsequently investigated. (Dkt. 157 ¶¶ 44–46; Dkt. 194 ¶ 45; Dkt. 216 ¶¶ 44, 46). Specifically, Little and Tiffany Madison expressed concerns to Fulks about comments Dawson purportedly made during the training. (Dkt. 195 ¶ 33.j; Dkt. 215 ¶ 33.j). Fulks met with Dawson to investigate these alleged complaints. (Dkt. 157 ¶¶ 45–46). On September 25, 2018, Caprara held a conference call with the staffers in Pod 4 to discuss the Campaign's investigation of the training. (Dkt. 157 ¶ 47). Caprara stated the Campaign did not instruct Dawson to tell the staffers not to say anything stupid before the training and the Campaign

23

considered Dawson's alleged comment unacceptable. (Dkt. 215 ¶ 27.m). The parties dispute whether, during this conference call, Caprara used profanity or yelled and whether Little was yelling and speaking over Caprara. (Dkt. 195 ¶ 27.m; Dkt. 215 ¶ 27.m).

### D.    *Procedural History*

On October 5, 2018, counsel sent a letter to the Campaign on behalf of Benton, Calhoun, Coleman, Colón, Kimble, Little, Nathaniel Madison, Tiffany Madison, and Walker demanding $7.5 million and a response by the following Monday (October 8, 2018). (Dkt. 157 ¶ 50). On October 16, 2018, counsel filed the present suit, adding Tinsley as a plaintiff. (Dkt. 1).

On October 17, 2018, Stratton made a public statement regarding the lawsuit, reproduced in full below:

> I am very proud of the campaign that JB and I have put together. The majority of our senior team are African American and almost 45% of our entire staff are people of color. When people feel like they have been harassed or discriminated against, they have the right to come forward and have their voices heard. In this case, we had a letter delivered to us asking for $7.5 million dollars in 24 hours or they threatened legal action and to go to press. That's not a good faith effort.

> The incidents listed in this complaint are baseless and make offensive claims in regard to several members of our staff. We stand by our staff and that's why we are not afraid to litigate this to the fullest extent of the law. I couldn't be prouder to be on the ticket with JB and of the statewide, grassroots campaign we've built.

(Dkt. 157 ¶ 53). Plaintiffs have not produced in discovery any statement by Stratton calling any Plaintiff an extortionist or stating that any Plaintiff committed extortion. (Dkt. 157 ¶ 55).

24

Counsel filed the operative Second Amended Complaint—on behalf of Benton, Calhoun, Chaney, Coleman, Colón, Hogan, Kimble, Little, Nathaniel Madison, Tiffany Madison, Tinsley, and Walker—on December 20, 2018. (Dkt. 28). Defendants moved to dismiss the Second Amended Complaint on December 28, 2018. (Dkt. 29; Dkt. 32). On April 5, 2019, this Court issued a Memorandum and Opinion order partially granting Defendants' motion to dismiss. (Dkt. 44). Only the following causes of action survived: (1) Count I: § 1981 harassment against the Campaign and Pharo on behalf of all Plaintiffs with the exception of Hogan, Chaney, and Calhoun; (2) Count II: § 1981 discrimination against the Campaign on behalf of all Plaintiffs; (3) Count II: § 1981 discrimination against Pharo on behalf of all Plaintiffs with the exception of Hogan, Chaney, and Calhoun; and (4) Count IV: defamation *per se* against Stratton on behalf of all Plaintiffs. (Dkt. 44 at 21).

Defendants moved for summary judgment on all remaining causes of action against on September 11, 2020. (Dkt. 133; Dkt. 135; Dkt. 137; Dkt. 139; Dkt. 141; Dkt. 143; Dkt. 145; Dkt. 147; Dkt. 149; Dkt. 151; Dkt. 153; Dkt. 155). Plaintiffs moved for summary judgment as to Count II on September 11, 2020. (Dkt. 164).

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g., Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). The parties genuinely dispute a material fact when "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"

*Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Ctr. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation omitted). "Rule 56 'mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "When reviewing cross-motions for summary judgment, we take the motions one at a time and for each on we construe all facts and draw all reasonable inferences in favor of the non-moving party." *Am. Family Mut. Ins. Co. v. Williams*, 832 F.3d 645, 648 (7th Cir. 2016) (citing *Steimel v. Wernert*, 823 F.3d 902, 910 (7th Cir. 2016)).

## DISCUSSION

## I.     Count I: Section 1981 Harassment

To survive summary judgment on a § 1981 harassment claim based on a hostile work environment, Plaintiffs must offer sufficient evidence "(1) he was subject to unwelcome harassment; (2) the harassment was based on race . . .; (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability." *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 636 (7th Cir. 2019) (quoting *Robinson v. Pearles*, 894 F.3d 818, 828 (7th Cir.

26

2018); *see also Yanick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011) ("We analyze § 1981 discrimination claims in the same manner as claims brought pursuant to Title VII of the Civil Rights Act."). When evaluating whether a work environment is hostile, courts look to (1) the frequency of the conduct; (2) whether the conduct was objectively offensive; (3) whether the offenses were physically threatening or humiliating; (4) the degree of interference with work; and (5) whether the conduct was directed at the Plaintiff in question. *Nichols v. Michigan City. Plant Plan. Dept.*, 755 F.3d 594, 601 (7th Cir. 2014). Hostile work environment claims are evaluated on a totality of the circumstances. *Boss*, 816 F.3d at 920. None of the incidents Plaintiffs point to satisfy this standard.

### A.     *Cultural Sensitivity Training*

Benton, Coleman, Colón, Kimble, Little, Nathaniel Madison, Tiffany Madison, Tinsley, and Walker offer the September 12, 2018, sensitivity training as evidence constituting § 1981 racial harassment amounting to a hostile work environment.[8] Once again, hampered by the poorly written and presented Rule 56 statements, the Court is left solely with an understanding of the alleged hostile work environment coming from a single session held on a single day where employees were trained presumably regarding the Campaign's efforts to encourage cultural sensitivity. The undisputed evidence shows that, during the training, Pharo sat next to Little and the presenter identified specific examples of language unacceptable in the workplace regardless of speaker or context. (Dkt. 157 ¶ 40; Dkt. 159 ¶ 97; Dkt. 194 ¶¶ 28.k,

---

[8] Dkt. 183 at 22; Dkt. 184 at 23; Dkt. 186 at 24; Dkt. 187 at 20–21; Dkt. 188 at 16; Dkt. 189 at 9–10; Dkt. 191 at 16–17; Dkt. 192 at 17; Dkt. 193 at 16.

40).  During the training, the presenter made use of a well-known study by asking Plaintiffs to watch a video and focus on how many times people in the foreground passed a ball, thereby causing Plaintiffs to "miss" a person wearing a gorilla costume walking through the background of the video.  (Dkt. 195 ¶ 29.u; Dkt. 215 ¶ 29.u). The parties dispute whether, before the training began, Dawson instructed Plaintiffs not to say "anything stupid."  (Dkt. 215 ¶¶ 27.j, 28.j). The parties also dispute whether, during a September 25, 2018, conference hall hosted by Caprara following up on complaints arising from the cultural sensitivity training, Caprara yelled or used profanity.  (Dkt. 195 ¶ 27.m; Dkt. 215 ¶ 27.m).

None of this, either in isolation or in concert, rises to the level of creating a hostile work environment.  First, no reasonable person would find these events objectively or subjectively hostile or abusive.  *See, e.g., Kenese v. Catholic Charities of Archdiocese of Chicago*, No. 18-cv-08272, 2012 WL 1192555, at *7 (N.D. Ill. Mar. 30, 2021) (citing *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002)).  There is nothing in the record to suggest that the words used in the training targeted any particular race or person.  In fact, the training was an attempt to do just the opposite—awaken employees to the differences amongst them.  To suggest a fleeting image of a gorilla in a video was sent as a message to discriminate against Plaintiffs, especially when taken into context of the awareness training, is simply not supported by the record.

Second, even if the Court were to presume that the cultural sensitivity training constituted harassment, no Plaintiff points to any evidence linking it with race.  *Cole*

*v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016) ("Although a connection between the harassment and the plaintiff's protected class need not be explicit, 'there must be *some* connection, for 'not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority.''") (quoting *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014)) (emphasis in original). Whether the training was ineffective or missed its mark is not the same as Little's inference that the mere fact of Pharo being a different race than he rendered her decision to sit next to him "intimidation." Such an inference on the facts before the Court is unreasonable. *See id*; (Dkt. 191 at 16–17). Any statements made by Dawson or Caprara, even if they occurred, cannot rise to the level of hostile work environment unless linked to race. If they simply said not to say anything stupid or used profanity during their discussion, they may not be effective even kind supervisors, but the statute does not protect Plaintiffs from poor supervisors; it protects them from hostility based on race. The facts that have been culled from this meager record simply do not support such a claim.

Third, these events were isolated incidents confined to a single day and, therefore, not "severe or pervasive." *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 646 (7th Cir. 2011) ("The Supreme Court teaches that isolated incidents, unless 'extremely serious,' will not support a hostile work environment claim.") (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

### B.    Racial Epithets

While Plaintiffs brief the issue of racial epithets in the workplace extensively,[9] the incidents for which they provide evidence are far more limited.  Certainly, when the Court sees racial epithets being used in any context, extra attention is necessary to scour the record in order to ascertain the facts.  This record shows two alleged instances of such epithets.  First, there is the sensitivity training where, in the context of identifying inappropriate workplace behavior, the presenter offered specific examples of that unsuitable language.  (Dkt. 159 ¶ 97; Dkt. 195 ¶ 28.k).  Second is Tinsley's disputed allegation that Flood told him "Newport" is an acronym for "niggers either working, pimping, or running things."  (Dkt. 195 ¶ 34.e; Dkt. 195-9 at 110:21–111:1; Dkt. 215 ¶ 34.e).  While use of racially toxic language in the workplace is no doubt serious, the presenter at the cultural sensitivity training used such language in the context of a training exercise as opposed to directing offensive language at any Plaintiff individually.  *See Nichols*, 755 F.3d at 601 (citing the target of the conduct as a factor bearing on whether a work environment is hostile).  The idea of the training was to actually show the workers how harmful or painful such language can be.  One might argue it is difficult to show where the line is drawn in the workplace with language without concrete examples.  Once again, clearly the training missed the mark for the Plaintiffs who felt that it was improper; yet, that is far different from being targeted based on race.  These trainers were not supervisors who were directing the plaintiffs in their daily activities; in fact, there is nothing in

---

[9] Dkt. 183 at 20; Dkt. 184 at 20; Dkt. 186 at 21–22; Dkt. 187 at 19; Dkt. 188 at 18–19; Dkt. 191 at 15–16; Dkt. 192 at 19; Dkt. 193 at 14–15.

the record to support any relationship between the Plaintiffs and these trainers other than the employees' obligation to attend the training.

The Seventh Circuit treats racist language used by coworkers less seriously than racist language used by supervisors. *Gates*, 916 F.3d at 638–39. Plaintiffs offer no evidence, nor can the Court find any in the record, that either the presenter at the cultural sensitivity training or Flood were supervisors. In fact, the record supports that the comments were made on a single day, in a single session, and were used as examples of what *not* to say in the workplace in an effort to promote cultural diversity and acceptance. Finally, even presuming racial epithets were used, this was an isolated incident, not a recurring daily environment, and is therefore insufficient to render the workplace hostile. *Nichols*, 755 F.3d at 601 (citing *Smith v. N.E. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004)) ("[O]ne utterance of the n-word has not generally been held to be severe enough to rise to the level of establishing liability.").

### C.    *Office Placement*

Benton, Tiffany Madison, Nathaniel Madison, and Walker cite their placement in their respective Region offices as workplace harassment. None points to any evidence that the Campaign assigned them to their Regions based on race and all three decry any knowledge of how the Campaign placed Field Organizers. (Dkt 174 ¶¶ 7, 20, 25; Dkt. 216 ¶¶ 7, 20, 25). Indeed, Tiffany Madison and Nathaniel Madison specifically applied to positions in, and Walker requested a transfer to, Region 6. (Dkt. 157 ¶¶ 5.j, 6–7; Dkt. 174 ¶¶ 18–19, 26; Dkt. 194 ¶¶ 5.j, 6–7; Dkt. 216 ¶¶ 7, 18, 26). Although Benton offers disputed evidence the Region 5 office was in a state of

disrepair, that does not alter the fact that Field Organizer placement does not amount to "discriminatory intimidation, ridicule, [or] insult" required for a hostile work environment. *Boss*, 816 F.3d at 920 (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)).

### D. Micromanagement

Walker characterizes several interactions with Doss, his supervisor, as "micromanagement" amounting to a hostile work environment. Specifically, Doss required him to report how many calls he made, how many doors he knocked on, and how many businesses he canvassed on a hourly basis. (Dkt. 195 ¶ 35.x; Dkt. 215 ¶ 35.x). Of course, Walker's job was to "get the vote out" for Pritzker, and knowing how many calls and doors he canvassed in a day would be a reasonable way of determining if he was doing that job well. Every supervisor must be able to assess whether his supervisee is fulfilling his job duties. Asking for a self-reporting of what work has been completed can hardly be deemed unreasonable. This is not conduct a "reasonable person would find hostile or abusive" and, therefore, does not constitute harassment. *Kenese*, No. 18-cv-08272, 2021 WL 1192555, at *7 (citing *Cerros*, 288 F.3d at 1045); *see also, e.g.*, *Glebocki v. City of Chicago*, 32 Fed. Appx. 149, 154 (7th Cir. 2002) (finding a supervisor "closely scrutinizing [an employee's] behavior" did not create an objectively hostile work environment). More importantly, Walker points to no evidence Doss's behavior was connected to his race nor did the Court find any in the record. *Cole*, 838 F.3d at 869 (requiring a "reasonable inference" linking harassment to a protected status).

### E. *Kimble and Tiffany Madison Harassment Allegations*

Both Kimble and Tiffany Madison characterize friction with co-workers as yielding a hostile work environment. Kimble was transferred from Region 7 to Region 6 due to interpersonal issues which, by her own admission, were unrelated to her race. (Dkt. 174 ¶ 21; Dkt. 216 ¶ 21). By definition, then, Kimble failed to offer evidence these unspecified "issues" were linked to race. *Cole*, 838 F.3d at 869. If every workplace disagreement could constitute a hostile work environment, the courts would be flooded with cases for relief. Workplace strife with a co-worker by itself cannot constitute hostile work environment.

Tiffany Madison reported Sands, her supervisor, for sexual harassment. Tiffany Madison claims the Campaign and Pharo failed to follow-up on her allegations which "revictimized" her and constituted an independent basis for § 1981 harassment. (Dkt. 192 at 17–18). But the record belies her allegations and shows instead that Pharo responded to Tiffany Madison's report within the hour, met with her to discuss the allegations, and fired Sands within 24 hours. (Dkt. 157 ¶¶ 21.3, 36–37). These facts can hardly constitute delay or neglect and most certainly cannot be evidence of "harassment" based on her race. *Id*.

### F. *Other Tinsley Allegations*

Tinsley points to two discreet interactions with supervisors as evidence of a hostile work environment, both of which are subject to dispute. Tinsley alleges that, at midnight before a scheduled day off, Oaks called Tinsley and instructed him to round up 40 African-American men for an event held the next day. (Dkt. 195 ¶ 34.d;

33

Dkt. 215 ¶ 34.d).  At another point, Tinsley claims Cascone "made [him] hop in a dumpster" to retrieve documents recording results of doors Tinsley knocked on.  (Dkt. 195 ¶ 34.i; Dkt. 195-9 at 101:4).  Both are isolated, one-off events not severe enough to rise to the level of creating a hostile work environment.  The incident involving Oaks, while perhaps irritating, would not strike the reasonable person as harassing or abusive and did not involve "ridicule, intimidation, [or] insult."  *Boss*, 816 F.3d at 920 (quoting *Alexander*, 739 F.3d at 982).  Tinsley's intimation that the mere fact he is African-American rendered Cascone's request racial harassment is too tenuous to link the behavior to a protected class.  *Cole*, 838 F.3d at 896.

### G.  Other Plaintiff-Specific Incidents

Colón and Little claim participation in various parades on behalf of the Campaign amounted to a hostile work environment.  The undisputed evidence is that Colón participated in the Mexican Day parade with other Campaign employees.  (Dkt. 195 ¶ 30.v; Dkt. 215 ¶ 30.v).  Mere participation alone does not constitute harassment, racial or otherwise.  Little testifies, although Defendants dispute his claim, that the Campaign picked only African-Americans to hold the Campaign banner at the Bud Billiken parade.  (Dkt. 166 ¶ 55; Dkt. 174 ¶ 55).  Even presuming Little's account is true, this isolated incident is not serious enough to rise to the level of creating a hostile work environment.  *Ellis*, 650 F.3d at 646.  Moreover, holding a banner in a parade is not something a reasonable person would find hostile or abusive.  *Kenese*, No. 18-cv-08272, 2021 WL 1192555, at *7 (citing *Cerros*, 288 F.3d at 1045).

34

### H.     Microaggressions

Plaintiffs suggest pervasive "microaggressions" created a hostile work environment.[10]  These vague, conclusory allegations unsupported by any specific examples or evidence from the record are inadequate to salvage Plaintiffs' § 1981 harassment claim on summary judgment.  *Coleman v. City of Peoria*, 925 F.3d 336, 345 (7th Cir. 2019) (quoting *Carmody v. Bd. of Tr. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018)) ("[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.").

Both in isolation and examined holistically, Plaintiffs fail to point to any evidence of conduct sufficiently severe or pervasive to alter the conditions of employment such that it creates an abusive relationship.  *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) (citing *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009)).  No reasonable jury could find either the Campaign or Pharo harassed any Plaintiff based on race.  Summary judgment as to Count I: Section 1981 Harassment is awarded in favor of Defendants.

## II.     Count II: Section 1981 Discrimination

To survive summary judgment on a § 1981 discrimination claim, Plaintiffs must supply enough evidence to "permit a reasonable factfinder to conclude that the plaintiff's race . . . caused [a] discharge or other adverse employment action."  *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 411–12 (7th Cir. 2018) (quoting *Ortiz*

---

[10] Dkt. 183 at 20–21; Dkt. 184 at 20–22; Dkt. 186 at 22; Dkt. 187 at 19–20; Dkt. 188 at 20–21; Dkt. 189 at 19; Dkt. 191 at 18–19; Dkt. 193 at 16.

*v. Werner Enters.*, 834 F.3d 760, 765 (7th Cir. 2016)).[11]  Courts do not look at any piece of evidence in isolation and, instead, "ask whether the totality of the evidence shows discrimination."  *Igasaki*, 988 F.3d at 958.

### A.  *Adverse Employment Action*

The existence of an adverse employment action is a threshold issue for a § 1981 discrimination claim.  *Madloc v. WEC Energy Grp., Inc.*, 885 F.3d 465, 470 (7th Cir. 2018).  An adverse employment action is "some quantitative or qualitative change in the terms or conditions of [the plaintiff's] employment that is more than a mere subjective preference[,]" "inconvenience[,] or [] alteration of job responsibilities."  *Id.* (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)); *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1069 (7th Cir. 2012).  "Not everything that makes an employee unhappy is an actionable adverse action."  *Madloc*, 885 F.3d at 470 (quoting *Johnson*, 325 F.3d at 901).  Generally, adverse employment actions fall within three categories: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfer or changes in job duties that cause an employee's skill to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as hostile work environment or conditions amounting to constructive discharge."  *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011).

---

[11] Plaintiffs apparently misapprehend the applicable legal standard by briefing a disparate impact theory.  (Dkt. 188 at 13–15; Dkt. 189 at 15–16; Dkt. 190 at 12–15; Dkt. 191 at 11–14; Dkt. 192 at 14–15; Dkt. 193 at 11–13).  Intentional discrimination claims under § 1981 cannot be supported by evidence of disparate impact.  *Franklin v. City of Evanston*, 384 F.3d 838, 847 (7th Cir. 2004); *see also, e.g., Bland v. Edward D. Jones & Co.*, No. 18-cv-03673, 2020 WL 7027595, at *15 n.7 (N.D. Ill. Nov. 30, 2020).

Plaintiffs fail to meet this threshold requirement because they offer no evidence from which a jury could reasonably derive an adverse employment action. Plaintiffs seek summary judgment as to Count II based on allegations of racial segregation in job assignments. (Dkt. 165 at 8–13). Even assuming for the sake of argument such segregation took place, it cannot support an adverse employment action absent evidence the segregation quantitatively or qualitatively impacted the terms of employment. *See, e.g., Martin v. F.E. Moran, Inc.*, No. 13 C 3526, 2018 WL 1565597, at *33–34 (N.D. Ill. Mar. 30, 2018); *E.E.O.C. v. DHL Exp. (USA), Inc.*, No. 10 C 6139, 2012 WL 5381219, at *2 (N.D. Ill. Oct. 31, 2012) (finding an adverse employment action "require[s] more than simply showing that the segregation occurred"). Beyond their bare assertions of racial segregation, Plaintiffs offer no such evidence.

None of the other events or actions detailed by Plaintiffs constitute materially adverse actions either. However distasteful they found it, there is no evidence the September 12, 2018, cultural sensitivity training altered any material aspect of Plaintiffs' employment. Similarly, although disputed evidence suggests unsatisfactory conditions at Benton's and Nathanial Madison's offices, these conditions do not amount to a significant change in employment status akin to termination or constructive discharge. *See Boss*, 816 F.3d at 917; *Barton*, 662 F.3d at 453; (Dkt. 195 ¶¶ 28.a, 32.i; Dkt. 215 ¶¶ 28.a, 32.i). So, too, with Calhoun's housing difficulties. Beyond the bare fact of several moves during her brief employment with the Campaign, Calhoun offers no evidence appropriate at summary judgment that

37

her housing constituted a diminution or alteration in benefits or amounted to constructive discharge. (Dkt. 157 ¶¶ 33–35; Dkt. 194 ¶ 35). Although Chaney, Hogan, and Kimble were transferred to new offices, the transfer did not alter their title, compensation, benefits, or responsibilities. (Dkt. 157 ¶ 24; Dkt. 174 ¶ 21; Dkt. 194 ¶ 24; Dkt. 216 ¶ 21); *E.E.O.C. v. AutoZone, Inc.*, 860 F.3d 564, 569 (7th Cir. 2017) ("It's well established that a purely lateral job transfer . . . does not constitute a materially adverse employment action.").

Finally, although Coleman, Colón, Kimble, Little, and Walker were all placed on paid administrative leave pending investigation into performance issues, this does not constitute a material adverse employment action. (Dkt. 157 ¶¶ 32, 52, 56–57; Dkt. 194 ¶¶ 57). Each retained full salary and benefits during this period and the leave itself had no impact upon their employment status. (Dkt. 157 ¶¶ 32, 52, 56–57; Dkt. 194 ¶¶ 57); *Nichols v. S. Ill. Univ. Edwardsville*, 510 F.3d 772, 786–77 (7th Cir. 2007) (holding paid leave pending investigation "does not constitute a *materially* adverse action") (emphasis in original).

Plaintiffs' failure to offer evidence of any material adverse employment action alone dooms their § 1981 discrimination claim.

### B. Caused by Race

Even had Plaintiffs identified a material adverse employment action, they nonetheless fail to attribute that action to race. *See Buford v. Laborers' Int'l Union Local 269*, 787 Fed. Appx. 341, 344 (7th Cir. 2019) (requiring evidence of discriminatory intent based on race to survive a summary judgment challenge to a

§ 1981 claim). Plaintiffs point to no evidence, beyond their unsupported assertions, that the Campaign assigned them to offices based on race. *Haynes v. Ind. Univ.*, 902 F.3d 724, 734 (7th Cir. 2018) (requiring proof of discriminatory intent based on race beyond "bald speculation"). Indeed, Benton, Coleman, Kimble, Little, Nathanial Madison, and Walker concede they do not know how the Campaign places Field Organizers. (Dkt. 174 ¶¶ 6, 7, 12, 20, 22, 25; Dkt. 216 ¶¶ 6, 7, 20, 22, 25); *Igasaki*, 988 F.3d at 958 (finding plaintiff's concession that he "specifically [did not] know what discriminatory reason [defendant] had" for her harsh treatment of him sufficient to "doom" his discrimination claim). Several Plaintiffs present evidence which contradicts their assertion race played a role in job placement, such as their application to a job in a specific Region. (Dkt. 157 ¶¶ 6–7; Dkt. 174 ¶¶ 7, 9, 18, 22; Dkt. 194 ¶¶ 6–7; Dkt. 216 ¶¶ 7, 18, 22). Undisputed evidence that Tinsley and Calhoun were placed Regions with a predominantly Caucasian population and Tinsley worked with two Caucasian Field Organizers further undercuts his position. (Dkt. 157 ¶¶ 1.e, 5.e; Dkt. 174 ¶¶ 24, 28; Dkt. 194 ¶¶ 1.e, 5.e; Dkt. 216 ¶¶ 24, 28). Finally, Hartman's comment that the previous Field Organizer whom Calhoun replaced was African-American does not support the inference that Calhoun was hired because of her race. (Dkt. 195 ¶¶ 26.b, 26.e; Dkt. 215 ¶¶ 26.b, 26.e); *see Coleman*, 925 F.3d at 345.

Nor do Plaintiffs point to evidence that the objectionable aspects of the September 12, 2018, cultural sensitivity training, office conditions, housing challenges, or transfer to new offices were racially motivated. Indeed, Kimble

concedes the transfer to the Region 6 office was unrelated to her race. (Dkt. 174 ¶ 21; Dkt. 216 ¶ 21). So, too, with the Plaintiffs placed on administrative leave. The record is devoid of any evidence Plaintiffs were placed on administrative leave because of their race instead of, for example, the documented performance issues exhibited during their employment. (Dkt. 157 ¶¶ 32, 56–57; Dkt. 194 ¶ 57). By way of illustration, Little was placed on administrative leave after he managed to predict a family emergency requiring time off almost two full weeks in advance. (Dkt. 157 ¶ 49).

Finally, while Chaney and Hogan were laid off by the Campaign, which constitutes an adverse employment action, both fail to offer any evidence beyond unsubstantiated speculation that they were let go because of their race. (Dkt. 157 ¶ 29; Dkt. 194 ¶ 29); *Barton*, 662 F.3d at 453 (enumerating termination as an adverse employment action). While Chaney offers disputed evidence Merritt, his supervisor, referred to him as a "niglet" and a "nigga", use of racist language only raises "an inference of discrimination" when "(1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Dass*, 675 F.3d at 1072. Merritt was not the decisionmaker in either Chaney's transfer or his March 25, 2018, termination when, incidentally, Merritt was also laid off. *See Phillips v. Spencer*, 793 Fed. Appx. 453, 438 (7th Cir. 2019) ("[T]he *decisionmaker*— not the supervisor—is what matters.") (Dkt. 157 ¶¶ 27–29; Dkt. 174 ¶¶ 33–34; Dkt. 194 ¶ 29; Dkt. 216 ¶¶ 33–34). Uncontested evidence offers several plausible, bias-free explanations. Chaney and Hogan were both informed they were being laid off on

March 25, 2018, in concert with the Campaign's downsizing between the primary and general elections. (Dkt. 157 ¶¶ 27–29; Dkt. 174 ¶¶ 33–34; Dkt. 194 ¶ 29; Dkt. 216 ¶ 33–34). Additionally, Chaney and Hogan exhibited documented performance issues, including failure to show up to work. (Dkt. 157 ¶¶ 25, 32). This evidence renders Plaintiffs' unsubstantiated speculation of racial animus even less plausible. *Haynes*, 902 F.3d at 734.

Based on the totality of the uncontested evidence, no jury could reasonably conclude Plaintiffs suffered any material adverse employment action based on race. Summary judgment on Count II: § 1981 Discrimination is awarded in favor of Defendants.

## III.    Count IV: Defamation *Per Se*

The only statement by Stratton which could plausibly form the basis of Plaintiffs' defamation *per se* cause of action is her October 17, 2018, statement made after the lawsuit was filed:

> I am very proud of the campaign that JB and I have put together. The majority of our senior team are African American and almost 45% of our entire staff are people of color. When people feel like they have been harassed or discriminated against, they have the right to come forward and have their voices heard. In this case, we had a letter delivered to us asking for $7.5 million dollars in 24 hours or they threatened legal action and to go to press. That's not a good faith effort.

> The incidents listed in this complaint are baseless and make offensive claims in regard to several members of our staff. We stand by our staff and that's why we are not afraid to litigate this to the fullest extent of the law. I couldn't be prouder to be on the ticket with JB and of the statewide, grassroots campaign we've built.

41

(Dkt. 157 ¶ 53). To maintain a cause of action for defamation under Illinois law, Plaintiffs must offer evidence Stratton (1) made a false statement about Plaintiffs; (2) made an unprivileged publication of that statement to a third party; and (3) Plaintiffs suffered damages as a result. *Bd. of Forensic Document Exam'rs, Inc. v. Am. Bar Ass'n*, 922 F.3d 827, 831 (7th Cir. 2019) (quoting *Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009)). Statements in which the defamatory nature is "obvious and apparent on [their] face" are defamatory *per se* and damages are presumed. *Id.* (quoting *Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006)). Five categories of statements are defamatory *per se* in Illinois but only three are of interest here: (1) words that impute a person has committed a crime; (2) words that impute a person is unable to perform or lacks integrity in performing his or her employment duties; and (3) words that impute a person lacks ability or otherwise prejudices that person in his or her profession. *Green*, 917 N.E.2d at 459; *see also Madison v. Frazier*, 539 F.3d 646, 653 (7th Cir. 2008) (applying Illinois law); *Muzikowski v. Paramont Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003) (applying Illinois law).

Two Plaintiffs—Chaney and Hogan—fail to clear even the first hurdle. Stratton's October 17, 2018, statement responded to the October 5, 2018, letter seeking $7.5 million sent on behalf of Benton, Calhoun, Coleman, Colón, Kimble, Little, Nathaniel Madison, Tiffany Madison, and Walker and the October 16, 2018, lawsuit filed on behalf of same plus Tinsley. (Dkt. 1; Dkt. 157 ¶¶ 50, 53). Chaney and Hogan were not added to the suit until December 19, 2018. (Dkt. 26). Even assuming for the sake of argument Stratton's October 17, 2018, statement was false,

it was not about Chaney or Hogan. *See, e.g., Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1112 (N.D. Ill. Mar. 21, 2016) (awarding summary judgment on defamation claim where statements were not about plaintiff).

The remaining Plaintiffs fail to identify evidence bringing Stratton's October 17, 2018, statement within any of the enumerated categories of defamation *per se*. For a statement to impute a criminal act, it "must be an express accusation of a specific indictable offence, not a mere inference of illegal activity." *See Kapotas v. Better Govt. Ass'n*, 2015 IL App (1st), ¶ 51. The October 17, 2018, statement does not so much as include the word "extortion" and Plaintiffs point to no evidence Stratton expressly stating any of them committed a criminal act. (Dkt. 157 ¶¶ 53, 55). Plaintiffs' assertion that "Ms. Stratton's comment viewed in their [*sic*] totality infer the crime of extortion"[12] by definition fails to meet this standard. *See Dobias v. Oak Park and River Forest High Sch. Dist. 200*, 57 N.E.3d 551, 563 (Ill. App. Ct. 2016) (stating courts are "not required to accept plaintiff's *interpretation* of the statement as defamatory *per se*, because the meaning of a statement 'is not a fact that can be alleged and accepted as true'") (quoting *Tuite*, 866 N.E.2d at 126).

The distinction between defamatory statements which suggest a person cannot perform, or lacks integrity in performing, their job and those which prejudice a person in his profession is a subtle one. *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 613 (7th Cir. 2013). "The former seems to imply some sort of on-the-job malfeasance; the latter covers suitability for a trade or profession." *Id*. For each, the statement

---

[12] Dkt. 183 at 24–25; Dkt. 184 at 24–25; Dkt. 185 at 27; Dkt. 186 at 26, 28–29; Dkt. 187 at 24–25; Dkt. 188 at 20–21; Dkt. 189 at 21–22; Dkt. 191 at 20; Dkt. 192 at 20; Dkt. 193 at 18.

must relate to job performance; "attacks related to personal integrity and character" are not defamatory *per se*. *Cody v. Harris*, 409 F.3d 853, 857 (7th Cir. 2005). Nothing in Stratton's October 17, 2018, statement bears on any Plaintiffs' performance, conduct, or abilities in carrying out their duties for the Campaign. (Dkt. 157 ¶ 53). Instead, the statement is entirely focused on their off-the-job conduct related to the present lawsuit. (Dkt. 157 ¶ 53, addressing the October 5, 2018, letter and the substance of the complaint). While sometimes integrity is so fundamental to a profession that an attack on personal character constitutes defamation *per se*, Plaintiffs' suggestion that politics is among this narrow category of callings[13] defies conventional wisdom. *See Pippen*, 734 F.3d at 613 ("When the subject of the false statements is employed in an occupation (schoolteacher, for example) that requires certain personal traits, such as trustworthiness, accusations of being a scam artist or an inveterate liar could lead to unemployment."); *see also Cody*, 409 F.3d at 857; George Orwell, *Politics and the English Language* (1946) ("Political language . . . is designed to make lies sound truthful and murder respectable[.]").

Accounting for all the undisputed evidence, no reasonable jury could find that Stratton defamed any Plaintiff. She was responding in a public statement to the allegations made against the Campaign by denying them. Summary judgment as to Count IV: Defamation *Per Se* is awarded in favor of Stratton.

---

[13] Dkt. 183 at 27–28; Dkt. 184 at 28; Dkt. 185 at 30; Dkt. 186 at 29–30; Dkt. 187 at 28; Dkt. 188 at 23; Dkt. 189 at 23–24; Dkt. 191 at 22–23; Dkt. 192 at 22–23; Dkt. 193 at 20.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motions for Summary Judgment are granted.  (Dkt. 133; Dkt. 135; Dkt. 137; Dkt. 139; Dkt. 141; Dkt. 143; Dkt. 145; Dkt. 147; Dkt. 149; Dkt. 151; Dkt. 153; Dkt. 155).   Plaintiffs' Motion for Summary Judgment is denied.  (Dkt. 164).  Judgment is to be entered in favor of Defendants pursuant to Federal Rule of Civil Procedure 56.  The case is terminated.

_____

Virginia M.  Kendall

United States District Judge

Date: August 18, 2021

45